520 So.2d 920 (1987)
Terry W. FELICE, Sr., Individually, et al., Plaintiffs-Appellees,
v.
VALLEYLAB, INC., et al., Defendants-Appellants.
No. 86-1018.
Court of Appeal of Louisiana, Third Circuit.
November 4, 1987.
Writs Denied January 8, 1988.
*922 Brame, Bergstedt & Brame, David A. Fraser, Lake Charles, for plaintiffs-appellees.
Camp, Carmouche, Barsh, Gray, Hoffman & Gill, David Frohn, Lake Charles, McGlinchey Stafford, Mintz, Cellini & Lang, Colvin G. Norwood, Jr., New Orleans, for defendants-appellants.
Before GUIDRY, FORET and YELVERTON, JJ.
YELVERTON, Judge.
This case involves a surgical accident to a two year old child. During a circumcision operation the child's penis was burned off by an electrosurgical device. The father, Terry W. Felice, Sr., individually and on behalf of his minor child, Jeffery Felice, and the mother, Lorraine Felice, filed suit against Valleylab, Inc., the manufacturer of the unit, and the State of Louisiana, through its agencies the Department of Health and Human Resources (DHHR), the Walter O. Moss Regional Hospital, and the Board of Supervisors of Louisiana State University (LSU). The trial of this case was bifurcated with the trial judge hearing the case as to the State defendants and the jury hearing the case as to Valleylab, Inc. The trial judge found the State defendants to be 100% at fault and returned a verdict in favor of the plaintiffs, Terry Felice and Lorraine Felice, individually, against the State in the amounts of $18,968.01 for past medical expenses and $100,000 in general damages, and in favor of Terry Felice on behalf of the minor child Jeffery Felice in the amount of $1,730,000. The jury returned a verdict in favor of the plaintiffs against Valleylab, Inc. in the amount of $2,750,000. The jury found Valleylab to be 30% at fault. Judgment was rendered according to the two verdicts. The defendants have appealed and the plaintiff has answered the appeal. We conclude that the jury was clearly wrong in finding Valleylab at fault. We agree with the trial judge that 100% of the fault lies with the State and its agencies. We reconcile the conflict in the award by finding the jury's assessment, $2,750,000, the more reasonable.
Before discussing the facts of the case, it is appropriate to explain the relationship between the Moss Regional Hospital, DHHR, and LSU. Walter O. Moss Regional Hospital is a charity hospital. The DHHR operates the charity hospital system throughout the State. There is an arrangement between the LSU Medical School System and the DHHR whereby Louisiana's charity hospitals are used as teaching hospitals. Dr. William Goodger and Dr. Cynthia Glass were residents training at Moss Regional Hospital. Both were under contract from LSU to the State to perform services at Moss Regional Hospital, and both were paid salaries by the State. Neither doctor was a board certified general surgeon.
Dr. Walter Clifton Payne, Jr. was an Associate Professor of Surgery on the faculty of the LSU Medical School. In that capacity, he acted as Chief of Surgery at University Medical Center in Lafayette, Moss Regional Hospital in Lake Charles, and Earl K. Long Hospital in Baton Rouge, all of which were affiliated with the LSU Training System. The residents working at Moss Regional Hospital at the time of this case were under Dr. Payne's supervision.

FACTS
In late January 1984 Jeffery's parents noticed that he complained of pain when he urinated and that the foreskin of his penis had difficulty retracting. He was examined by a physician and his condition was diagnosed as phimosis. Circumcision surgery was recommended, and Jeffery was *923 admitted to Moss Regional Hospital. The surgery was performed on February 2, 1984 by Dr. William Goodger, a first year family practice resident at the hospital, under the supervision of Dr. Cynthia Glass, a third year surgical resident. The two residents were the only doctors present during the surgery. Dr. Glass instructed Dr. Goodger to perform a circumcision technique known as the guillotine technique. In this technique the foreskin of the penis is stretched past the end of the penis and clamped with a hemostat to hold the foreskin in a position to be cut off. After the excess foreskin is cut away, the bleeding is controlled and the edges of the foreskin are sutured together. Generally the cutting in circumcisions is performed with a scalpel.
Dr. Goodger, under the supervision of Dr. Glass, was instructed to cut the foreskin with a cutting instrument known as the Valleylab Electrosurgical Unit, known as an ESU. This unit operates by applying a high frequency electrical current through a "surgical pencil" to the cutting area. The electronic cut of the ESU reduces bleeding at the cutting area and eliminates the necessity of "tying-off" the vessels. The unit has two modes: cut and coagulation. The surgery in the present case was begun in the cut mode on a setting of one on the power dial, and raised to two-and-one-half when the initial setting failed to make a cut. Dr. Glass instructed Dr. Goodger to cease cutting after he had cut approximately one-third of the distance across the foreskin. Dr. Glass observed that something was wrong because the penis had retracted and was very pale. Dr. Glass then became aware that the penis had sustained a full thickness burn. The ESU never touched the clamp during the surgery. The record is clear the penis was burned by excess electrical current running through the penis. Dr. Glass then removed the rest of the foreskin with scissors and sutured it by hand. A burn ointment, Silvadene, was applied to the burned area.
On February 8, 1984 the child was sent home. Several days later he began running a high fever and was taken back to the hospital where he was transferred to New Orleans Charity Hospital. Eventually his external penile tissue sloughed away leaving him with no visible penile tissue. Put in simpler terms, his penis was gone.
Because of this injury Jeffery has suffered from physical problems with his urethra, the channel between the bladder and the penis, and has undergone four additional surgical procedures.

PLEADINGS AND FINDINGS OF FACT
The plaintiffs' suit alleged that Dr. Glass had committed malpractice, that DHHR was responsible through respondeat superior, and that DHHR and LSU had failed to adequately train and supervise Dr. Glass. Neither Dr. Glass nor Dr. Goodger were made defendants. Valleylab was made a defendant based on the alleged failure to adequately warn of the dangers of the ESU.
In this bifurcated trial the trial judge found that Dr. Glass had committed malpractice and therefore found DHHR to be liable for the actions of its employees. The trial judge also found the State negligent holding that the LSU Medical School and Moss Regional were independently guilty of administrative negligence. The trial judge determined that the Medical School was negligent because it did not adequately instruct its students in the proper use and dangers of the ESU, and he found the hospital independently negligent because it did not adequately supervise Dr. Glass. The basis for the jury's finding that Valleylab was liable was its failure to adequately warn of the dangers of the ESU.
On this appeal all findings of fact by both jury and judge are made issues, and the amount of the award, as well as a reconciliation of the disparate awards, is also an issue.

RULES OF APPELLATE REVIEW IN A BIFURCATED TRIAL
Valleylab argues that the two verdicts are in conflict because the trial court found the State 100% at fault and 0% fault on the part of Valleylab and the jury found Valleylab 30% at fault and the State 70% at *924 fault. The plaintiffs argue that the two verdicts, to the extent that they impose liability, do not conflict.
In a bifurcated trial where the jury and the trial judge reach conflicting findings of fact and there is an appeal, the court of appeal should resolve these differences and render a single harmonized decision based on the record as a whole. Bishop v. Shelter Insurance Co., 461 So.2d 1170 (La.App. 3rd Cir.1984) writ denied 465 So.2d 737 (La.1985). In such a situation the manifest error rule is inapplicable and the court of appeal must decide which decision is more reasonable after a careful examination of the record. Bishop v. Shelter Insurance Co., supra, and Deville v. Town of Bunkie, 364 So.2d 1378 (La.App. 3rd Cir.1978), writ denied 366 So.2d 564 (La.1979).
As indicated in Bishop, supra, an appellate court is called upon to harmonize jury and trial court conflicts in bifurcated trials only when the jury and the judge reach conflicting findings of fact. A finding of fault is a finding of fact. It is possible that any number of parties can be at fault. An act that causes damage can be caused by the concurring negligence, or fault, of more than one person. La.C.C. arts. 2323 and 2324. Accordingly, a finding by a jury that a person is at fault and a finding by a judge that another person is at fault are findings that are not necessarily in conflict. When there is no conflict, these findings of fact are reviewable under the clear error standard. In such a case (absent clear error) when percentages of fault are assigned, and all persons who are at fault are accounted for, but the percentages of fault assigned do not add to exactly 100%, there is a conflict in the findings of fact as to the percentages, and that conflict has to be harmonized. The clear error standard is inapplicable in such a situation, but only as to the assessment of percentages of fault. The findings of fact as to fault itself remains subject to the clear error standard.
In the present case there is no conflict in the findings of fact as to fault. When these findings of fact are subjected to the clear error test, the judge's finding passes (though for different reasons, as we shall later explain). The jury's finding as to Valleylab, however, is clearly wrong. The only fault in the case lies with the State, and where there is but one person at fault in a case, percentage of fault is always 100%. Bishop, supra.
We find also that the jury's assessment of damages and the trial judge's assessment of damages are in conflict and must be harmonized. See Hatcher v. State, Department of Transportation and Development, 478 So.2d 774 (La.App. 3rd Cir.1985), writ denied, 479 So.2d 923 (La.1985). This requires an examination of the record to inquire which award of damages is the more reasonable award.

THE FAULT OF VALLEYLAB
This case was presented to the jury on the basis of Valleylab's failure to warn of the risk of using the machine on small appendages. In Bloxom v. Bloxom, 512 So.2d 839 (La.1987) the Supreme Court stated the following:
In order to recover from a manufacturer, the plaintiff must prove, among other essentials, that his damage resulted from a condition of the product that made it unreasonably dangerous to normal use. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986); Hunt v. City Stores, 387 So.2d 585 (La.1980); Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978); Weber v. Fidelity & Casualty Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971). "Normal use" is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product. Rey v. Cuccia, 298 So.2d 840 (La.1974); Branch v. Chevron Oil Co., Inc., 681 F.2d 426 (5th Cir. 1982); LeBouef v. Goodyear Tire & Rubber Co., 623 F.2d 985 (5th Cir.1980).
A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Halphen, supra, at 115. In the context of the manufacturer's duty to warn of the dangers in the use of a product, the manufacturer *925 is obligated to anticipate the environment in which the product will be used and to give notice of the potential risks arising from foreseeable use in the foreseeable environment. See Conder v. Hull Lift Truck, Inc., 405 N.E.2d 538 (Ind.Ct.App.1980). Although a manufacturer markets a product for an intended use, in considering various instructions and warnings, a manufacturer may not simply close his eyes to hazards associated with foreseeable misuse of the product. When product misuse and its attendant risks are reasonably foreseeable, the manufacturer is in the best position to avoid product related injuries by giving an adequate warning. Id. at 546. See also Sales, The Duty to Warn and Instruct for Safe Use In Strict Tort Liability, 13 St. Mary's L.J. 521, 533-38 (1981).
The product in the present case is an electrosurgical unit manufactured by Valleylab and designated as Valleylab Model SSE2L. The unit operates by applying a high frequency electrical current through a "surgical pencil" to the cutting area. The device is described as a closed circuit instrument. A conductive or grounding pad is placed under the patient. The electrical current then runs from the "surgical pencil" through the patient and is routed back to the ESU by way of the grounding pad. The device can be operated in either the cut or coagulation mode on several power settings. In the cut mode the device is said to "mimic a scalpel", and is intended for use in the operating room. The device cuts into the tissue by heating the tissue along the cut line.
At trial the expert testimony agreed that the accident occurred as a result of the introduction of too much electricity to the cutting area. Dr. James Brennan, a professor of electrical engineering, explained the general principles. Electricity has the ability to generate heat through any form of conductor. However, the heat will be concentrated more where the conductor is smaller; this principle is known as current density. On the cut mode the generator is on, constantly generating a continuous stream of electricity. In the present case the conductor of electricity was a very small penis of a two year old child.
Dr. Leonard Knapp, a general surgeon, did some research for purposes of his testimony and explained that when too much electricity goes through a small area the heat causes the blood vessels in an appendage to thrombose. The blood vessels coagulate cutting off the blood supply to the tissue. He referred to this phenomenon as the "channeling" effect which is caused by too much electricity running through a small area. Dr. Knapp stated that the medical research he had done on the subject revealed that channeling has occurred most commonly in operations of the finger, penis or testicles. Dr. Knapp was not aware of this risk prior to his research.
Dr. Dennis Tucker, a clinical pathologist, did not believe the injury was caused precisely by "channeling", but improper use of the ESU was responsible. He opined that the current was on too high a setting for that small cross-sectional area and that the heat from the current caused the burn. He agreed that surgery on small extremities can be very dangerous with electrosurgery. He noted various studies that involved burns occurring from the use of an ESU in circumcisions.
Valleylab objected to the testimony of Dr. Brennan and Dr. Knapp, complaining that these witnesses were not properly qualified to offer their opinion testimony as to how the injury occurred. We disagree. Dr. Brennan was offered as an expert in the field of electrical engineering. He had a degree in electrical engineering and merely expressed his opinion on the effects of electricity being conducted through a small area. After a careful review of the record we find the trial court did not abuse its discretion in allowing Dr. Brennan's testimony.
Dr. Knapp was offered as an expert in general surgery. Dr. Knapp gave his opinion as to how the injury occurred, described the consequences of a severe burn, and discussed the lack of warnings in the ESU manual. Dr. Knapp explained the information that he had obtained from his *926 study of the subject matter, and related what the medical journals had expressed as a danger and consequence of using an ESU in cutting small appendages. He also gave a medical opinion on how the heat destroys tissue. We find the trial court did not abuse its discretion in accepting Dr. Knapp as an expert and in allowing his testimony.
In the present case the ESU was intended to be used in most surgical procedures either to cut the tissue or to be used to stop the bleeding. The obvious, or ordinary, user of these machines are the surgeons who manipulate the "surgical pencil". We find that using the ESU to cut on a small appendage is a foreseeable use of this machine. The evidence is clear that most physicians are unaware of the dangers inherent in using the ESU to cut upon small appendages, such as a child's penis. Surgeons cannot be required to be completely knowledgeable as to the mechanics of complex hospital equipment. Such expertise is reserved to the manufacturers and design engineers.
Valleylab argues that it did not have a duty to warn since surgeons should be considered a "sophisticated user" of the product and surgeons should therefore be presumed to know of the dangers through their familiarity with the device.
Surgeons may have expertise in how to manipulate the "surgical pencil" in making a cut, and may have knowledge as to some of the dangers associated with the use of an ESU. All the surgeons involved in the case knew not to touch metal (the clamp) during a surgery, and knew to insure that the grounding pad was attached to the patient. However, their familiarity with the machine did not extend to the dangers of the effect of the flow of electricity through a small area. Therefore, in this particular situation, even if it can be said that surgeons are "sophisticated users" of the equipment, the evidence is quite sufficient that the danger in the present case was not a danger which a surgeon should be presumed to know through his familiarity with the machine.
We agree with the argument that Valleylab was obligated to anticipate that the ESU would be used in the cut mode for circumcision surgery, and to give notice of the inherent danger of potentially causing a severe burn arising from the foreseeable use.
Valleylab failed to give a notice or warning of this potential danger. Neither the manual nor the machine contain any warnings about the danger of using the ESU to cut upon small appendages. The manual is replete with advice about how effective the device is when removing small appendages, but nowhere is there a specific warning about what to do if it is the surgeon's intention not to remove the appendage. In fact, the manual represents to the reader that the ESU is generally safe and that it can be used in almost any surgical procedure. The manual contains detailed descriptions on how the ESU is to be used in various surgical procedures. However, there are no warnings or instructions on how to use the ESU in a routine circumcision. There were not adequate warnings placed on the machine itself. The machine merely indicated that the device produces "hazardous electrical output". It is clear that Valleylab failed to give adequate notice of the danger inherent in using the ESU in making a cut in a circumcision, or other surgeries involving small appendages. This failure resulted in the product being unreasonably dangerous in normal use.
We find, however, that the absence of warning was not a cause-in-fact of Jeffery's injury.
In Bloxom v. Bloxom, supra, the Supreme Court further stated:
An essential element of the plaintiff's cause of action for failure to adequately warn of a product's danger is that there be some reasonable connection between the omission of the manufacturer and the damage which the plaintiff has suffered. Halphen, supra; Hebert v. Brazzel, 403 So.2d 1242, 1244 (La.1981); Weber, supra; see, generally, Prosser & Keeton on Torts § 41, Twerski, Seizing the Middle Ground, 57 N.Y.U.L.Rev. 521, 562 (1982). Once a plaintiff proves that the lack of *927 an adequate warning or instruction rendered the product unreasonably dangerous, his cause in fact burden is assisted by a presumption: when a manufacturer fails to give adequate warnings or instructions, a presumption arises that the user would have read and heeded such admonitions. Benoit v. Ryan Chevrolet, 428 So.2d 489, 493 (La.App. 2d Cir.1982); Technical Chemicals Co. v. Jacobs, 480 S.W.2d 602, 606 (Tex.1972); Wolfe v. Ford Motor Co., [6 Mass.App. 346], 376 N.E.2d 143 (1978); Nissen Trampoline Co. v. Terre Haute First National Bank, 332 N.E.2d 820, 826-27 (Ind. App.Ct.1975); Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1281-82 (5th Cir. 1974); Jackson v. Johns-Mansville Sales Corp., 727 F.2d 506, 523 (5th Cir.1984). The presumption, may, however, be rebutted if the manufacturer produces contrary evidence which persuades the trier of fact that an adequate warning or instruction would have been futile under the circumstances. Cf. Margo v. Ragsdale Bros., Inc., 721 S.W.2d 832 (Tex. 1986); See Note, Products Liability, 50 Tex.L.Rev. 577 (1972); McCormick on Evidence, 3d ed. § 343 (1984).
By Dr. Glass' own testimony she admitted that she had never read the warning label on the device itself, and that she had never read the manual. An adequate warning or instruction would have been futile under the circumstances.
We accordingly hold that the jury's finding of liability on the part of Valleylab was clearly wrong, since there is absent the essential element of cause in fact.

THE LIABILITY OF THE STATE
1) Dr. Glass
The applicable statutes in a medical malpractice action based on negligence are La. R.S. 9:2794(A) and La.R.S. 40:1299.39(A)(4). La.R.S. 9:2794(A) provides as follows:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.R.S. 40:1299.39(A)(4) provides as follows:
(4) "Tort" means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession licensed to practice in the state of Louisiana who is in good standing in a similar community or locale, and to use reasonable care and diligence, along with his best judgment, in the application of his skill; provided, however, that in the case of a health care provider practicing in a recognized field of specialty, the standard of care in rendering professional services or health care to a patient shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of that specialty in good standing, and to use *928 reasonable care and diligence, along with his best judgment, in the application of his skill.
In the present case Dr. Glass was a licensed physician in her third year of residency in surgery. Since she was limiting her practice to general surgery and holding herself out as so limiting her practice, we find that she was a "specialist" within the meaning of R.S. 40:1299.39(A)(4) and R.S. 9:2794(A)(1). Williams v. Lallie Kemp Charity Hospital, 428 So.2d 1000 (La.App. 1st Cir.1983) writ denied, 434 So.2d 1093 (La.1983).
Specialists are required to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within their medical specialty. Steinbach v. Barfield, 428 So.2d 915 (La.App. 1st Cir.1983), writ denied, 435 So.2d 431 (La.1983). Where the alleged acts of negligence raise issues peculiar to the particular medical specialty involved, then only those qualified in that specialty may offer evidence of the applicable standards. Steinbach v. Barfield, supra.
In this case the actual circumcision surgery was performed by Dr. Goodger, a family practice resident, under the supervision of Dr. Glass, a third year general surgery resident. Dr. Goodger had never performed a circumcision with an ESU or in a surgical suite. Dr. Glass was in charge of the surgery and instructed Dr. Goodger on the technique to be used. Dr. Glass instructed Goodger to use the guillotine technique with the use of an ESU to cut the foreskin. Dr. Goodger assumed Dr. Glass had experience and had been trained to perform the circumcision in this method. However, Dr. Glass testified that she had been trained to perform a circumcision with a scalpel in medical school and that she had not been instructed on the use of an ESU in circumcisions. She had always performed circumcisions with a scalpel until one week before the Felice surgery. On that occasion one week earlier, she and Dr. Boustany, another resident, discussed the possible benefits in using an ESU for a circumcision. Dr. Glass was also in charge of that surgery. They believed the ESU would control the bleeding, so they performed a circumcision with an ESU, with no ill effects. Dr. Glass never inquired of her supervising doctors as to whether the use of an ESU was proper for circumcision surgery. She did not inspect the literature or the manual to see if there would be any dangers in the use of ESU in circumcision. Dr. Glass merely decided to try it and see what effect the ESU would have upon the surgery, since she considered it an improvement upon well-established technique. Dr. Glass also admitted that she had never held the ESU "surgical pencil" in her hand to cut the foreskin in a circumcision. She twice had instructed two residents on a procedure she had never performed herself. Dr. Glass also admitted that it was a precept of medicine that any modification of a learned technique would never be done without a full appreciation of all the risks involved in the modification.
Dr. Leonard Knapp, a general surgeon, testified that Dr. Glass' behavior was below the standard of care that one would have expected to have been used in such a situation. He testified that Dr. Glass fell below the standard of care by failing to have adequate knowledge of the risks involved before modifying a familiar technique and in failing to explore the potential risks with her supervising personnel. Dr. Clifton Payne of the LSU Medical School also confirmed Dr. Knapp's testimony and opined that Dr. Glass fell below the standard of care required before making a modification of learned technique.
Under the circumstances we discern no error in the trial judge's finding that Dr. Glass was negligent in modifying the circumcision technique on Jeffery Felice. If Dr. Glass had used the technique she had learned in medical school, the severe burn to Jeffery Felice would not have resulted.
Dr. Glass was employed by a State Agency, the Department of Health and Human Resources (DHHR), she was working in a State-run facility, the Moss Regional Hospital, and she was under the supervision *929 of still another State Agency, the LSU Medical School. The trial judge properly found the State vicariously responsible for Dr. Glass' negligence.
2) The LSU Medical School
The trial judge also found the LSU Medical School independently negligent for failing to instruct its students in the proper use and dangers of the ESU unit.
The record does not support a finding of negligence on the part of the medical school in its failure to properly train Dr. Glass. Dr. Glass was a third year resident (out of a five year program) learning to be a general surgeon. If any duty was owed by the medical school in this connection to train Dr. Glass, it was a duty to instruct her on the proper techniques in performing surgeries. The record is clear that Dr. Glass was properly instructed on how to perform a routine circumcision using the guillotine technique and making the incision with a scalpel and scissors.
We find, however, that the medical school was negligent in its supervision of Dr. Glass in her residency training. At the time of the Felice surgery, the residency program had in effect the following regulation:
"No third year resident is to do an elective operative procedure without staff present in the operating room. This rule is good for twelve months of the year."
Dr. Isodore Cohn, Chairman of the Department of Surgery at the LSU Medical School and a professor of surgery, testified that the purpose of the rule was to protect the patients, residents, and everyone concerned with the care of the patients. The evidence revealed that the circumcision in question was an elective surgery and Dr. Cohn admitted that the performance of the Felice surgery without staff present was a violation of the rule. On rebuttal Dr. Cohn again testified and stated that the rule was followed and applied only in major surgeries, not minor surgeries as in circumcisions. Dr. Cohn also admitted that the medical school was responsible for supervising the residents it trains in its programs.
Under these facts we find that the medical school, as the agency having supervision over the surgeons, owed a duty to the patient, Jeffery Felice, to have the elective surgery supervised by the medical school staff or a certified general surgeon. By having a policy of applying the regulation only to major surgeries the medical school breached its duty in the present case. It is also clear that the standard of care required of a general surgeon in performing a surgery is to deviate from standard techniques only after exploring the potential risks involved in the modification. In the present case it is probable that if a certified general surgeon had supervised the Felice surgery, he would not have allowed the residents to modify well-established techniques without first exploring the risks involved. Therefore, we find a causal connection between the failure of the medical school to supervise the surgery and the damages which resulted from the modification of well-established technique. The trial judge was correct in holding that the Board of Supervisors of Louisiana State University representing the medical school is directly and independently liable for Jeffery Felice's damages. For this reason plaintiffs' recovery will not be affected by the limitation of liability provision of La.R.S. 40:1299.39. See Sibley v. Board Of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985).

DAMAGES
We now must reconcile the conflicting damage awards made to the plaintiffs in this bifurcated trial and determine which award, the trial judge's or the jury's, is the "more reasonable" award.
The record shows that Jeffery suffered greatly as the tissue of his penis withered away from the burn. For days he screamed "it hurts". There was nothing that could be done to save the tissue. Jeffery now has no visible penis tissue left. The medical testimony presented two future alternatives. The first is possible reconstructive surgery when he reaches puberty. Dr. Ortenberg, a urologist, suggested *930 the possibility of the removal of fatty tissue in order to try to make the stump of the penis appear more prominent. Currently the stump is flush with the abdominal wall. Jeffery's second alternative is for a sex change operation.
Dr. Aretta Rathmell, Jeffery's psychiatrist, testified that the child will need intermittent psychiatric counseling to help him cope with crises as they occur. She said that there is a high possibility his loss will affect his self-identity. She said that Jeffery will undoubtedly experience anger and frustration as he grows older and probably will direct that anger against his parents.
The usual guidelinespain and suffering, disability, loss of income, future medicalare inappropriate to measure this loss. Pain, the doctors say, although intense at first, is now gone. Future medical treatment and expenses could be enormous, but no one knows for sure. The urination function is accommodated by a still-working, albeit shorter, urethra. As a physical person who can eat, drink, sleep, work, think, Jeffery probably can meet objective standards for normal performance.
It is elsewhere that his loss lies. Sexual pleasure, procreativity, marriage in any normal sense, these things will never exist for him. The suffering of deprivation, both physical and mental, that will accompany him throughout his life can be only vaguely imagined. What will his puberty be like? Where will he go to escape the cruel and ribald jokes of his comrades? For that matter who will be his comrades? Into what corner of his dark cell will he seek refuge when the natural urgings of his body wage battle?
There is a suggestion in the evidence that he can be changed into a woman. As a means of mitigating damages in this case, we view this prospect as pure speculation. If it is realistic to imagine he may one day find a new life in this way, it is just as realistic to speculate that after the sex change, he may wish it had never been done.
A jury of 12 persons using common sense has reached a figure of $2,750,000. We find that under the circumstances of this case, the jury award of $2,750,000 is the more reasonable total damage award. Of this amount, we hold that the parents individually are entitled to $118,968.01, the amount determined by the trial judge. The balance is for the child.
For the above reasons we reverse and set aside the judgment of the jury holding Valleylab at fault, and affirm the judgment of the trial judge holding the State 100% at fault. We harmonize the awards by rendering judgment in favor of the plaintiffs, Terry Felice and Lorraine Felice, individually, in the collective total of $118,968.01, and in favor of Terry Felice, Sr., on behalf of the minor Jeffery Felice, in the amount of $2,631,031.99, all sums to bear interest from date of judicial demand, against the defendant, the State of Louisiana, through the Department of Health and Human Resources and through the Board of Supervisors for Louisiana State University. Costs, both in the trial court and on appeal, in the total amount of $8,485.56, are to be paid by the State of Louisiana.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.
GUIDRY, J., concurs and assigns written reasons.
FORET, J., concurs, but could vote for an increase in the general damages award.
GUIDRY, Judge, concurring.
I fully agree with the result reached however, I concur to express my disagreement with the majority's conclusion that there is no conflict in the findings of fact as to fault in this bifurcated trial.
Under our law (La.C.C.P. art. 1812) the trier of fact, in making a determination on the issue of defendant's fault, is required to consider and determine whether another party, whether party or not, was at fault, and, if so, whether such fault was a legal cause of the damages, and, if so, the degree of such fault, expressed in percentages. In the instant case, the trial judge found the State of Louisiana 100% at fault. This conclusion obviously negates the finding *931 of fault on the part of any other person, whether party or not. Specifically, it negates the finding of any fault on the part of Valleylab. On the other hand, the jury determined that the accident was caused by the combined fault of Valleylab and others, presumably the State of Louisiana, and assigned a percentage of fault to Valleylab of 30%. This finding obviously fixes a 70% degree of fault attributable to others and, specifically, the State. In my view, these findings on the issue of fault clearly conflict.
My brethren of the majority rely upon our decision in Bishop v. Shelter Insurance Company, 461 So.2d 1170 (La.App. 3rd Cir.1984), writ denied, 465 So.2d 737 (La.1985), for support of their conclusion. I respectfully disagree with our decision in Bishop, supra. In Bishop, a bifurcated trial, the court concluded that there was no conflict in the findings on the issue of fault which required harmonization because:
"However, regardless of the jury's intention, it did not, as a matter of law, have the right or the duty to determine whether the Department of Transportation was at fault and, if so, the percentage thereof. LSA-R.S. 13:5105 clearly provides that, "No suit against the state or a state agency or a political subdivision shall be tried by jury." Thus, as a matter of law, the jury verdict has no weight on the issue of the State's fault. Under this view, there is no conflict between the finding of fact by the jury and that by the judge on the issue of the State's fault. It follows that since there is no conflict between the triers of fact, there is no need for the Court of Appeal to harmonize in accordance with the jurisprudence discussed above. It also follows that in our appellate review of the facts found by the jury and the facts found by the trial judge the applicable rule will be the well established test of whether the trier of fact was clearly wrong."
I respectfully disagree with this pronouncement. As aforestated under La.C.C.P. art. 1812, the trier of fact, whenever appropriate, has not only the right but the duty to consider and determine whether another party, whether party or not, was at fault, and, if so, whether such fault was a legal cause of the damages, and, if so, the degree of such fault, expressed in percentages.
For these reasons, I respectfully concur.