STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-687
CONSOLIDATED WITH 19-688


GRACE LANTIER

VERSUS

JAMES LEE CASKEY, ET AL.


CONSOLIDATED WITH


MARIANNE WALSH

VERSUS

JAMES LEE CASKEY, ET AL.



**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 126518
HONORABLE CURTIS SIGUR, DISTRICT JUDGE

**********

**D. KENT SAVOIE**
**JUDGE**

**********

Court composed of Billy Howard Ezell, Shannon J. Gremillion, and D. Kent
Savoie, Judges.


**AFFIRMED AS AMENDED.**

**A. R. Johnson, III**
**Kevin W. Welsh**
**Phelps Dunbar, LLP**
**400 Convention Street, Suite 1100**
**Baton Rouge, Louisiana 70802-5618**
**(225) 346-0285**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**BNSF Railway Company**
**James Lee Caskey**

**Kevin M. Dills**
**Davidson, Meaux, Sonnier**
**Post Office Drawer 2908**
**Lafayette, Louisiana 70502**
**(337) 237-1660**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**BNSF Railway Company**
**James Lee Caskey**

**Morris M. Haik, III**
**Attorney At Law**
**511 West St. Peters Street**
**New Iberia, Louisiana 70560**
**(337) 560-4357**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**BNSF Railway Company**
**James Lee Caskey**

**Katherine P. Martin**
**Martin Mayard, LLC**
**Post Office Box 81338**
**Lafayette, Louisiana 70598-1338**
**(337) 291-2440**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**State Farm Mutual Automobile Insurance Company**

**Sera Hearn Russell, III**
**Attorney at Law**
**Post Office Box 53866**
**Lafayette, Louisiana 70505-3866**
**(337) 769-3260**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
**Grace Lantier**

**M. Charles Brandt, Jr.**
**Attorney at Law**
**111 Mercury Street**
**Lafayette, Louisiana 70503**
**(337) 237-7171**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Marianne Walsh**

**SAVOIE, Judge.**

After a trial on the merits, a jury found Defendant James Lee Caskey eighty-percent (80%) at fault for the automobile accident at issue; the jury found Plaintiff Grace Lantier twenty-percent (20%) at fault. The jury rendered judgment: (1) in favor of Grace Lantier and against James Lee Caskey and Defendant BNSF Railway Company (BNSF), in the total amount of $181,774.40, plus legal interest and court costs; (2) in favor of Plaintiff Marianne Walsh and against James Lee Caskey and BNSF, in the total amount of $980,570.40, plus legal interest and court costs; and (3) in favor of Marianne Walsh and against Defendant State Farm Mutual Automobile Insurance Company in the amount of its policy limits totaling $25,000.00. Grace Lantier, Marianne Walsh, James Lee Caskey and BNSF appealed the judgment. For the following reasons, we affirm the judgment with amendment.

## FACTS AND PROCEDURAL HISTORY

On February 25, 2015, Grace Lantier was driving eastbound along Highway 182 towards New Iberia, Louisiana, with her daughter, Marianne Walsh, riding as a guest passenger. Highway 182 is a two-lane highway with a shoulder on each side. On one side of the roadway, there are railroad tracks owned and operated by BNSF. At the same time, James Caskey, acting in the course and scope of his employment with BNSF, was testing a signal along the rail line parallel to the highway.

There is a dispute between the parties on the location of the vehicles at the time of the accident. Grace Lantier and Marianne Walsh recall that Mr. Caskey's vehicle was located on the shoulder on the right-hand side of the highway. As the Lantier vehicle was passing the Caskey vehicle, Plaintiffs' assert that James Caskey executed a left-hand turn from the shoulder, striking the passenger side door of the Lantier vehicle. James Caskey testified that he had merged completely into the eastbound lane of travel from the shoulder, using his turn signal. He asserts that he still had his turn signal on when he slowed the vehicle and attempted to make a left-hand turn

across the westbound lane of the highway. Caskey claims that, while he was attempting the turn, the front, left corner of his vehicle struck the passenger side of the Lantier vehicle.

Grace Lantier and Marianne Walsh filed separate lawsuits against James Caskey, BNSF and State Farm Automobile Insurance Company in the trial court. The two suits were subsequently consolidated. After a trial on the merits, James Caskey was found to be eighty-percent (80%) at fault, and Grace Lantier was found to be twenty-percent (20%) at fault for the accident. Damages were awarded to both Grace Lantier and Marianne Walsh. Grace Lantier, Marianne Walsh, James Caskey and BNSF now appeal.

### GRACE LANTIER'S ASSIGNMENTS OF ERROR

1. The jury found 20% fault on Ms. Lantier when neither of the railroad employees saw her car, prior to or during the accident, and the railroad employee driver – Caskey – made a left turn into the side of Ms. Lantier's car.

2. The jury awarded future medical bills of $76,229.60 to Ms. Lantier but did not award a sum for future general damages.

3. The jury awarded $50,000 in past general damages, which does not properly coordinate with the $100,989.22 in past medical bills.

### MARIANNE WALSH'S ASSIGNMENT OF ERROR

1. The jury placed 20% fault on Ms. Lantier. There is no factual scenario under which Ms. Lantier could be found guilty of negligence. Mr. Caskey, the BNSF employee, made a left turn into [the] passenger door side of Ms. Lantier's vehicle and claimed that he never saw her prior to the collision.

### JAMES CASKEY'S AND BNSF'S ASSIGNMENTS OF ERROR

1. The jury manifestly erred in assigning only 20% fault to the driver of the overtaking vehicle.

2. The jury abused its discretion in awarding $675,000 in general damages to the passenger in the overtaking vehicle.

3. In the alternative, the jury abused its discretion in awarding $150,000 in loss of enjoyment of life damages to the passenger in the overtaking vehicle.

2

## LAW AND DISCUSSION

*I.      Fault*

*A. Standard of Review*

In *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989) (citations omitted), the Louisiana Supreme Court explained:

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

"A finding of fault is a finding of fact." *Felice v. Valleylab, Inc.*, 520 So.2d 920, 924 (La.App. 3 Cir.1987), *writs denied*, 522 So.2d 562, 563 (La.1988). As such, we will review the issue of fault under a manifest error standard.

B. *Allocation of Fault*

All parties on appeal take issue with the jury's allocation of fault in this matter. The jury found James Caskey to be eighty-percent (80%) at fault in causing the collision, while finding Grace Lantier to be twenty-percent (20%) at fault.

In *Hill v. State Farm Mutual Automobile Insurance Company*, 19-395, p. 3 (La.App. 3 Cir. 11/13/19), 283 So.3d 629, 632 (first alteration in original), a panel of this court explained:

> In determining whether the trial court was clearly wrong in its allocation of fault, the appellate court is guided by the following factors set forth in *Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967, 974 (La.1985):
>
>> (1) [W]hether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

These same factors guide the appellate court's decision with respect to the highest or lowest percentage of fault that could reasonably be assessed. *Clement* [*v. Frey*, 95-1119 (La. 1/16/99),] 666 So.2d 607.

"We are also aware that the allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the factfinder within that range cannot be clearly wrong." *Fontenot v. Patterson Ins.*, 09-669, p. 22 (La. 10/20/09), 23 So.3d 259, 274 (citing *Foley v. Entergy La., Inc.*, 06-983 (La. 11/29/06), 946 So.2d 144. "Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award." *Id.* (citing *Clement*, 666 So.2d 607).

In the present case, the parties do not agree regarding the location of the subject vehicles at the time the accident occurred. Plaintiffs contend that Caskey was attempting to make a left-turn from the shoulder when his vehicle collided with the Lantier vehicle. It is Caskey's position that he had already merged completely into the eastbound lane before he attempted the left-turn.

The *Hill* court considered the following law in regard to left-turning motorists:

> In Louisiana, a "left-turning motorist and the overtaking and passing motorist must exercise a high degree of care because they are engaged in dangerous maneuvers." *Kilpatrick v. Alliance Cas. & Reinsurance Co.*, 95-17, p. 4 (La.App. 3 Cir. 7/5/95), 663 So.2d 62, 66, *writ denied*, 95-2018 (La. 11/17/95), 664 So.2d 406. The duty of a left turning motorist is governed by La.R.S. 32:104 which provides, in pertinent part:
>
> > A. No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in R.S. 32:101, or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety.
> >
> > B. Whenever a person intends to make a right or left turn which will take his vehicle from the highway it is then traveling, he shall give a signal of such intention in the manner described hereafter and such signal shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.

Pursuant to this article, a left turn is a dangerous maneuver which cannot be undertaken unless the turning driver ascertains that it can be safely made. *Layssard v. State of Louisiana, Dep't of Pub. Safety & Corrs.*, 07-78 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053, *writ denied*, 07-1821 (La. 11/9/07), 967 So.2d 511. "A left-turning motorist involved in an accident is burdened with a presumption of liability and the motorist must show that he is free from negligence." *Id.* at 1059 (quoting *Thomas v. Champion Ins. Co.*, 603 So.2d 765, 767 (La.App. 3 Cir. 1992)). "The onerous burden placed upon a left-turning motorist is not discharged by the mere signaling of an intention to turn." *Kilpatrick*, 663 So.2d at 66. The giving of a signal is immaterial if the left-turning motorist did not have the opportunity to safely make the turn. *Id.* Additionally, "in a vehicular collision case, the plaintiff may take advantage of a presumption of the defendant's negligence when the plaintiff proves the defendant executed a left-hand turn and crossed the center line at the time of impact." *Id.* at 66.

The duty of a vehicle passing on the left is governed by La.R.S. 32:73, which provides:

> The following rules shall govern the overtaking and passing of vehicles proceeding in the same direction, subject to those limitations, exceptions, and special rules hereinafter stated:
>
> (1) Except when overtaking and passing on the right is permitted, the driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance, and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle.
>
> (2) Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal, and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.

There are certain limitation on a vehicle passing to the left, as noted in La.R.S. 32:75:

> No vehicle shall be driven to the left side of the center of the highway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken. In every event the overtaking vehicle must return to the right-hand side of the roadway before coming within one hundred feet of any vehicle approaching from the opposite direction.

*Hill*, 283 So.3d at 632-33.

Grace Lantier testified that it was raining on the day of the accident. When she noticed Caskey's white truck, it was parked on the shoulder. As she approached, she saw the brake lights on the Caskey vehicle illuminated, but she did not see his blinker activated. She stated that the Caskey vehicle then took off before stopping suddenly. She testified that this caused her to slow down to a stop because she thought that the Caskey vehicle was attempting to enter the roadway. When it did not, she proceeded along the highway. As she passed, she contends that the Caskey vehicle made contact with the Lantier vehicle, causing the accident.

Mr. Caskey testified that he was in the area working on the train signal. He parked his truck on the shoulder of the road. When he was finished with the job, he entered his truck and began talking to his boss on his cell phone. Mr. Caskey testified that he was talking "hands free" on his cell phone. He further testified that he was on his cell phone when the crash occurred. Regarding the crash, Mr. Caskey explained:

> When I proceeded to come from where I was parked out onto the highway, to prepare to make my left-hand turn in the driveway, which is down the road, I don't know the exact distance, I did not see her. I had looked in my mirror, my side mirrors, and looked like this (Indicating) and I did not see her.

When opposing counsel asked if he looked back "right before you made your left-hand turn," Mr. Caskey testified that he did not. Mr. Caskey stated that he had his blinker on to make a left-hand turn as he approached the private driveway into which he intended to make his turn. It is Mr. Caskey's testimony that, as soon as he crossed the center line, he hit the Lantier vehicle as she was attempting to pass him.

The jury was presented with the testimony of Trooper Scott Verrett, who investigated the accident. He testified that, at the accident scene, neither party disputed the fact that Mr. Caskey was making a left-hand turn at the time of the accident. Rather, they disputed the location of the vehicles. Trooper Verret testified that he was unable to find any skid marks or tire marks to indicate where the accident

6

occurred because the conditions were wet. He also stated that, by the time he arrived on scene, the vehicles had been moved. Trooper Verret testified that the speed limit on the highway was fifty-five miles per hour and there was no evidence that either driver exceeded the speed limit. Trooper Verret further testified that passing is permitted along this part of the highway.

After a review of the record, we find that the jury's allocations of fault are reasonable. It is undisputed that Mr. Caskey was left-turning motorist at the time of the accident. As such, he undertakes a high degree of care and has a presumption of liability. Mr. Caskey testified that he was on his cell phone, albeit "hands free," and that he did not look back immediately before executing his turn. Further, regarding Ms. Lantier, she testified that she slowed to a stop in the middle of the road because she was aware that Caskey's vehicle may be attempting to enter the roadway. Further, the jury could have reasonable believed Mr. Caskey's testimony that he had his blinker on when he was attempting his turn. "[T]he trier of fact is bound to consider the nature of each party's wrongful conduct and the extent of the causal relationship between that conduct and the damages claimed." *United States Aircraft Insurance Group v. Global Tower, LLC*, 19-844, p. 28 (La.App. 3 Cir. 5/20/20), 298 So.3d 214, 234 (citing *Watson*, 469 So.2d 967). We do not find that the jury's allocation of fault was manifestly erroneous.

II. *Damages*

A. *General Damages Awarded to Marianne Walsh*

Defendants contend that the jury's general damages awarded to Marianne Walsh are excessive. Marianne Walsh was awarded $675,000.00 in total general damages, which the jury allocated as follows:

| | |
|---|---|
| Past Pain and Suffering | $85,000.00 |
| Future Pain and Suffering | $340,000.00 |
| Past Mental Anguish and Pain | $25,000.00 |

7

| | |
|---|---|
| Future Mental Anguish and Pain | $25,000.00 |
| Disability and Loss of Function | $50,000.00 |
| Loss of Enjoyment of Life | $150,000.00 |

In the recent case *Allison v. Citgo Petroleum Corporation*, 19-523, pp. 6-8 (La.App. 3 Cir. 12/18/19), 286 So.3d 1152, 1161, *writ denied*, 20-123 (La. 3/9/20), 294 So.3d 483 (alterations in original), a panel of this court discussed the law applicable to a review of a general damages, stating:

> As stated by this court in *Thibeaux v. Trotter*, 04-482, p. 3 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, 1130, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31:

> > The types of damages awarded in a personal injury action consist of general and special damages. General damages, are speculative in nature and, thus, incapable of being fixed with any mathematical certainty. They include pain and suffering, physical impairment and disability, and loss of enjoyment of life. *Wainwright v. Fontenot,* 00-0492 (La. 10/17/00), 774 So.2d 70. Special damages, however, may be determined with some degree of certainty and include past and future lost wages and past and future medical expenses. *Id.*

> General damages are reviewed for an abuse of discretion because the trial court "is in the best position to evaluate witness credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 4 (La. 4/4/08), 979 So.2d 456, 459. "The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact." *Cormier v. Citgo Petroleum Corp.*, 17-104, p. 4 (La.App. 3 Cir. 10/4/17), 228 So.3d 770, 776, *writ denied*, 17-2138 (La. 2/9/18), 237 So.3d 491. The trier of fact has great, even vast discretion in awarding general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

> "Mental anguish and grief refers to the 'pain, discomfort, inconvenience, anguish, and emotional trauma' that accompany the injury. *McGee* [*v. A C And S, Inc.*, 05-1036, (La. 7/10/06), 933 So.2d 770,] 775." *Rachal v. Brouillette*, 12-794, p. 5 (La.App. 3 Cir. 3/13/13), 111 So.3d 1137, 1142, *writ denied*, 13-690 (La. 5/3/13), 113 So.3d 217. Further, "[l]oss of enjoyment of life refers to the detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury." *McGee*, 933 So.2d at 775. "[W]hether or not loss of enjoyment of life is recoverable depends on the particular facts of the case, and

should be left to the district court's discretion on a case-by-case analysis." *Id.* at 779. Additionally, in reviewing a general damage award, "a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion, and if the total general damage award is not abusively high, it may not be disturbed." *Pennison v. Carrol*, 14-1098, pp. 14-15 (La.App. 1 Cir. 4/24/15), 167 So.3d 1065, 1078, *writ denied*, 15-1214 (La. 9/25/15), 178 So.3d 568.

Marianne Walsh was riding as a guest passenger in her mother's car at the time of the accident. The Caskey vehicle struck the Lantier vehicle on the guest passenger side with enough force to send the Lantier vehicle spinning in a 360-degree motion multiple times. Ms. Walsh was transported to the emergency room via ambulance. On the day of the accident, Marianne Walsh was twenty-one (21) years old and in good health.

Dr. John Sledge, an orthopedic surgeon, testified that he first saw Ms. Walsh on May 18, 2015, about three months post-accident. He stated that "she was having mostly neck pain with decreased cervical range of motion." Dr. Sledge diagnosed Ms. Walsh with cervical radiculitis, which is a nerve pain which radiates down her arm from her neck. Dr. Sledge prescribed a cervical epidural steroid injection for this pain. Because Ms. Walsh was still in pain after the steroid injection, Dr. Sledge prescribed a posterior facet injection in her neck. Dr. Sledge testified that, while she still had some pain after this injection, the decrease in the rating of her pain was significant. Because of the positive results she received from the first posterior facet injection, Ms. Walsh opted to have another one, however, her symptoms returned. At that point, Dr. Sledge performed a medial branch block. Dr. Sledge described the procedure as follows:

> So the radiofrequency ablation is the next procedure, but there's two steps to it. So as we talked about, instead of putting the medicine into the facet joint, there's a nerve that comes up the side of the facet and actually innervates the facet joint. So what we do is we try to put a little medicine next to that nerve, the numbing medicine, the Lidocaine and Marcaine, and see if it relieves their pain. If it does, it means that nerve is the one that's sensing the pain.

If that nerve is the one, then what we can do in a second procedure at another time is put a needle next to that nerve again, but instead of putting medicine we can heat the end of the needle, and it's call[ed] a thermal ablation or a radiofrequency, since we use radio waves to create the heat. And what we can do is we can actually ablate; it's basically like cutting the nerve. We just do it with a needle and do it with heat. If we do that and that's where their pain is coming from, these patients often get long lasting relief, twelve, eighteen months and sometimes permanent relief, from the procedure.

Dr. Sledge testified that Ms. Walsh did have neck pain relief with this procedure, and he expected that relief to last for twelve to eighteen months. Dr. Sledge testified that, at that point, Ms. Walsh could either continue with the epidural and facet blocks, which would give temporary relief, or whether she wants to move forward with the more definitive treatment, which would be a two-level neck fusion. He testified that the epidural and facet blocks cannot be performed indefinitely. He stated that they become less effective the more they are performed. Dr. Sledge testified that, in his opinion, Ms. Walsh would eventually need a two-level neck fusion with the next ten years. Describing the two-level neck fusion, Dr. Sledge testified:

We make an incision on the front of the neck, because the disc[s] are in the front of the spine, and we don't want to have to move the spinal cord if we don't need to. So we make an incision on the front, pull the tissues to the side, we would take out the majority of the disc at C5-C-6. We would take out the majority of the disc at Ck6-C7. By removing the disc, we remove those tears, the fissures, the annular fissures. We're also able to take the pressure off of the nerve root. We then put in a spacer at each level and then put in some bone graft at each level and then we put a plate on the front. The plate holds it still just so the bones have a chance to heal. Similar to a broken bone or a fracture, that bone will heal and become one solid piece of bone.

Dr. Sledge stated that post-operative spinal surgery follow-up would occur every two weeks, then six weeks, then three months, then six months and eventually he would see her once a year for the rest of her life.

Dr. Sledge testified that Ms. Walsh also complained of shoulder pain, and, after an MRI and other testing, Dr. Sledge determined that she suffered from tendinosis, which is an injury to the muscle tendon junction. Dr. Sledge testified that he

10

prescribed Ms. Walsh anti-inflammatories, gave her Lidocaine injections, and had her undergo physical therapy in an attempt to relieve her of pain. None resolved her symptoms. Dr. Sledge stated that he had tried all of the conservative methods other than surgery, but they did not work. Dr. Sledge testified that he believed Ms. Walsh needs surgery for her injury. He further testified that her shoulder would not heal without surgery. He described the type of surgery, arthroscopic acromioplasty, that Ms. Walsh needs as follows:

> [W]e do acromial resection; so that the piece of bone above it which is pinching on the muscle, we'll basically take off the lower portion of it, roughly the lower third, to make that a larger space so that it doesn't irritate the tendon.
>
> The other thing we'll do while we're there is repair the muscle, repair that tendon as it comes through, remove some of that - - the granulation tissue, which is the body's response to try to repair it, but by trying to repair it they make a scar and the scar makes the muscle and tendon that much bigger. So we'll take that muscle and tendon back down to their normal size, open up that interval so it's no longer being irritated; we may or may not remove a portion of the distal clavicle; that seems to help these patients; it depends on what it looks like at the time of the surgery.

Dr. Sledge explained that an arthroscope is used to make three incisions during the surgery. He stated:

> So we have three portals. One you put a periscope through so you can look and actually see inside the joint. With the - - one of the other portals you put an instrument, so it may be scissors, it may be a burr, it may be a shaver, it may be a grabber, in order to be able to manipulate the tissues of the shoulder.
>
> And the third one is because we can't get to all parts of the shoulder just coming in one direction, so you usually see, one, very lateral, which we're looking through the periscope so we can see the whole shoulder as we look around, and then, two, in different locations, so we can get to the different locations in the shoulder.

Dr. Sledge testified that the recovery time for this type of procedure is three months. Counsel asked:

> Q. Okay. And during that three months, you recommend that somebody not do any work or do modest work or light duty work? I mean, what - - what is your recommendation after the shoulder surgery?

A.     It depends upon what they do.  So, they're pretty uncomfortable for about six weeks; they're usually in a sling, taking it out for physical therapy and range of motion exercises.  Generally, most people, no matter what they do, don't work for that first six weeks.  After that next six weeks, it really sort of depends upon what their occupations is.  Even at three months, we talk about the recover being three months, if they have a job which requires significant mobility or safety with that arm of interest, then they need to delay six months or so going back to work.

Dr. Sledge testified that she would require physical therapy two to three times a week for about four weeks post-surgery.  He testified that Ms. Walsh was under physical limitations.  She is restricted from carrying more than ten pounds in one hand or twenty pounds with two hands.  Dr. Sledge also recommends that she sit and stand frequently in order to change the load on her cervical spine.  Ms. Walsh is restricted from repetitive bending, twisting or lifting.  Dr. Sledge also restricted her to a pushing or pulling limit of fifty pounds.

At the time of trial, Dr. Sledge was prescribing Ms. Walsh both Tramadol, a pain reliever, and Flexeril, a muscle relaxant, one to two times per day.  He testified that he expected her to need these medications for the remainder of her life.

Marianne Walsh testified that she used to be a very active person and was known as a tomboy.  She states that she no longer does sporting activities she once did, like swimming or playing tennis.  Ms. Walsh testified that she has pain and numbness in her fingers and that she is scared to undergo spinal surgery.  She no longer "horses around" with her niece.

Ms. Walsh's, ex-fiancee, Nicholas Vinturella also testified and reiterated Ms. Walsh's testimony.  Mr. Vinturella and Ms. Walsh were together for eight years, including before and after the accident.  He testified that she was much less active and usually wanted to stay home and watch movies due to her pain.  He stated that he saw Ms. Walsh in constant pain.  Mr. Vinturella testified that she could not throw a towel over the shower rod or put her hair in a ponytail due to the pain in her shoulder and

neck. Mr. Vinturella felt like she had a form of depression, which was not diagnosed, and that he had found her hysterically crying.

In addition to general damages, Marianne Walsh was awarded $74,000.00 in past medical expenses and $476,713.00 in future medical expenses. After a review of the testimony and medical evidence in the record, we find that the trial court was within its discretion in awarding Marianne Walsh $85,000.00 for past pain and suffering; $340,000.00 for future pain and suffering; $25,000.00 for past mental anguish; $25,000.00 for future mental anguish; $50,000.00 for disability and loss of function; and $150,000.00 for loss of enjoyment of life. Given Ms. Walsh's young age; future surgeries, treatments, and medications needed; limitations placed on her; and the effect it has had on her life, we cannot say that the trial court abused its discretion. Accordingly, we find no merit in Defendants' argument that Marianne Walsh's general damages award was excessive.

### B. Lack of Future General Damages Awarded to Grace Lantier

Grace Lantier asserts that the jury erred by awarding her damages for future medical expenses, but declining to award her an amount for future general damages. While there is no bright-line rule on this issue, "a jury verdict awarding medical expenses but simultaneously denying damages for pain and suffering will most often be inconsistent in light of the record." *Wainwright v. Fontenot*, 00-492, pp. 6-7 (La. 10/17/00), 774 So.2d 70, 75. "[T]he ultimate question has been whether the factfinder made inconsistent awards and thus abused its discretion." *Id.*

The jury awarded Grace Lantier future medical expenses in the amount of $76,229.60. Ms. Lantier has had two bilateral carpal tunnel surgeries, one on each wrist, as a result of the accident. Dr. Sledge testified that she needs spinal surgery to correct a ruptured disc.

Ms. Lantier testified that, at the time of trial, she had ongoing back pain, and she was going to physical therapy for the pain. She further testified that prior to the

13

accident, she played tennis quite often; however, since the accident, she cannot play. When cooking certain things, such as spaghetti, she needs help because she can't lift the pot.

The jury agreed with Dr. Sledge that Grace Lantier would need a future spinal surgery due to the injury she received from the accident and her recurring pain. As such they awarded her $76,229.60 in future medical expenses. We find the record supports an award for future general damages to Ms. Lantier. She has ongoing pain, and the spinal surgery will require extensive recovery time. Therefore, we amend the judgment to award Grace Lantier $50,000.00 in future general damages.

*C. Past General Damages Awarded to Grace Lantier*

Grace Lantier complains that the amount awarded to her for past general damages should be increased. Ms. Lantier was awarded $100,989.22 for past medical expenses and $50,000 in past general damages. Ms. Lantier's past general damages were allocated as follows:

| | |
|---|---|
| Past Pain and Suffering | $30,000.00 |
| Past Mental Anguish and Pain | $15,000.00 |
| Loss of Enjoyment of Life | $5,000.00 |

The Defendants argue that an analysis of the record supports the jury's finding of $50,000.00 for general damages. Defendants contend that Ms. Lantier's credibility is the reason that the jury did not award a higher amount in general damages. Credibility may be considered by the reviewing court as part of its quantum analysis. *See Dixon v. Travelers Ins. Co.*, 02-1364 (La.App. 4 Cir. 4/2/03), 842 So.2d 478, *writ denied*, 03-1482 (La. 9/26/03), 854 So.2d 366.

Defendants point to several instances wherein Ms. Lantier lacked credibility before the jury. At trial, Ms. Lantier claimed that she could not remember injuries that she suffered in three prior vehicle accidents, despite the fact that she received medical treatment for those injuries. Ms. Lantier suffered from carpal tunnel

14

syndrome pain and sought medical treatment; however, at trial she couldn't remember certain episodes of carpal tunnel syndrome that she suffered. Ms. Lantier also claimed that she could not remember the times she went to the doctor to treat symptoms of anxiety and depression. Defendants also point out that, although Ms. Lantier claimed that she would be on light duty work for the rest of her life, she worked construction immediately after her carpal tunnel surgeries.

"Given that '[r]easonable persons frequently disagree about the measure of general damages in a particular case,' a general damage award may be disturbed on appeal only when 'the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances.'" *Dixon*, 842 So.2d at 485 (quoting *Youn,* 623 So.2d at 1261 (alteration in original). Given the record before us, we cannot say that the jury in this case went beyond what a reasonable trier of fact would assess for past general damages under the circumstances; and therefore, the jury did not abuse its discretion.

## DECREE

For the foregoing reasons, the judgment of the trial court is amended to include future general damages awarded to Grace Lantier in the amount of $50,000.00. The judgment is affirmed in all other respects. Costs of this appeal are assessed equally between BNSF Railway Company, James Lee Caskey, and Grace Lantier.

**AFFIRMED AS AMENDED.**