711 So.2d 745 (1998)
Ricky WYATT, et al., Plaintiffs-Appellant,
v.
RED STICK SERVICES, INC., et al., DefendantsAppellees.
No. 97-1345.
Court of Appeal of Louisiana, Third Circuit.
April 1, 1998.
*747 James La Rue Harmon, New Orleans, Mitchel Mark Evans, II, DeRidder, for Ricky Wyatt, et al.
Jeffrey Martin Cole, Lake Charles, for Red Stick Services, Inc. et al.
Dan Arthur Smetherman, New Orleans, for Ampacet Corporation.
Before YELVERTON, SAUNDERS and PICKETT, JJ.
YELVERTON, Judge.
This case arises out of a trip and fall accident on February 5, 1992. Ricky Wyatt fell over some dirty uniforms on the floor of the locker room while on his job at Ampacet Corporation. Ray Sonnier, an employee of *748 Red Stick Services, Inc. and Cintas Sales Corporation of Louisiana, Inc., who was there to pick up the dirty clothes, had put the uniforms on the floor of the locker room. Wyatt and his wife filed a tort suit against Red Stick, Cintas, Sonnier, and their insurers for the personal injury damages he sustained as a result of the accident. Ampacet Corporation and its workers' compensation insurer, Liberty Mutual Insurance Co., intervened in the suit for reimbursement of medical benefits paid to Wyatt.
Prior to trial Wyatt's wife's claim was voluntarily dismissed. A bifurcated trial was held on October 21-24, 1996. A jury determined Wyatt's claims against Sonnier and Red Stick/Cintas. The trial court determined the workers' compensation reimbursement claim of Ampacet and Liberty Mutual. At the conclusion of the trial, the jury found that both Sonnier and Wyatt were at fault for the accident. It assessed Sonnier with 65% of the fault and Wyatt with 35% of the fault. The jury then awarded the following damages: (1) $40,000 in general damages; (2) $37,191.90 for past medical expenses; (3) $160,000 for loss of past wages; and (4) $30,000 for loss of earning capacity. These damages do not include an adjustment for comparative fault.
The trial court, writing its reasons for judgment while the jury was out deliberating, found that Sonnier was free from fault and denied Ampacet's intervention claim. The court subsequently reconciled the two decisions, apparently on its own motion. The trial court's reconciliation resulted in its adoption of the jury's findings as to liability and damages. In a single judgment dated February 11, 1997, the court gave Wyatt 65% of the jury's damage award, less medical paid by Ampacet, or $153,966.15 (65% of $267,191.90$30,320.90). The judgment gave Ampacet 65% of the medical expenses it had paid on behalf of Wyatt, or $19,708.59 (65% of $30,320.90).
Subsequently, following a motion for a judgment notwithstanding the verdict (JNOV), or for a new trial, or for a remittitur, the trial court granted a JNOV setting aside the jury verdict and its own "reconciled" decision and dismissed Wyatt and Ampacet's claims against Sonnier, Red Stick/Cintas and Lumberman's Mutual. The trial court further conditionally granted a new trial in the event the JNOV is reversed by this court. Wyatt filed the present appeal.

FACTS
On February 2, 1992, Wyatt reported to work to begin his 7:00 a.m. shift as an extruder operator at Ampacet. After setting up the line for about ten minutes, Wyatt left to go to the locker room to get some pain medication. He opened the door in the locker room. The center was blocked by a row of lockers. There were two routes to his locker. One was down a walkway which was a direct route to his locker. The other was an access way which was only two and onehalf feet wide.
A co-worker, Lynn Hamilton, who had finished his shift was undressed and preparing to shower. He was standing in the narrow access way. The other route was blocked by Sonnier who was collecting dirty uniforms provided by Cintas. Sonnier had placed a shirt in the middle of the floor and was piling dirty uniforms on top of the shirt. Sonnier explained that after he had completed his pile, he would make a bundle, tying a shirt around the pile of uniforms to make it easier to carry.
Wyatt chose to walk down the walkway where Sonnier was piling the dirty uniforms. Wyatt explained that he chose that route because he did not want to invade his coworker's space since the co-worker was undressed and the space was very narrow. He explained also that the route Sonnier was occupying was a direct route to his locker that he used the most.
said, "Excuse me." Sonnier stepped back, and Wyatt proceeded to step over the pile of clothes. Wyatt claims he felt a garment drape over his right leg, he lost his balance, and he fell. As he was falling his legs twisted, and he felt his knee pop. The only factual dispute is whether Sonnier actually threw another shirt that hit Wyatt and caused him to fall while he was passing over the pile of dirty clothes. Sonnier denies that *749 he did. Wyatt admits he did not see Sonnier throw anything.
As a result of the accident, Wyatt alleged that he injured his left knee, left shoulder, and left hand. Specifically, Wyatt claimed that he suffered an anterior cruciate ligament insufficiency in his left knee, an impingement in his left shoulder, and a carpal tunnel syndrome in his left hand. Wyatt continued working after the accident.
Wyatt eventually saw Dr. David Steiner, an orthopedic surgeon, on March 4, 1992, about his left knee. Dr. Steiner had previously operated on Wyatt's left knee twice; once in 1988 and once in 1989. Dr. Steiner had seen Wyatt off and on since the surgeries. He had last seen Wyatt on December 16, 1991, before the accident. Wyatt's left knee was bothering him quite a bit at that time.
When Wyatt went to see Dr. Steiner after the accident, he complained of pain in his left knee and left elbow. On a visit on May 8, 1992, Wyatt complained of his right knee, but there were never again any complaints about the right knee. Wyatt complained that the left knee was unstable.
On September 4, 1992, Wyatt complained for the first time about pain in his left shoulder. He told Dr. Steiner that it had been bothering him since the accident. Dr. Steiner noted poor range of motion and tenderness in the shoulder. Although Dr. Steiner did not feel that the shoulder was significant, he agreed that impingement syndrome can be caused by trauma. September 4, 1992 was the last time Wyatt saw Dr. Steiner.
Wyatt also saw Dr. James Perry, an orthopedic surgeon, on March 1, 1993, for complaints of pain in his back and shoulder. Wyatt had another on-the-job accident in October 1992 while lifting a breaker plate. This accident is not the subject of the present suit. It was after the October accident that Wyatt did not return to work at Ampacet, because he was laid off. Wyatt had continued working after his February 5,1992 accident.
Dr. Perry opined that Wyatt had impingement syndrome of the left shoulder. Dr. Perry also stated that it is possible for an accident to cause impingement syndrome, but he did not believe that it would be related to an accident if there was no pain until seven months after the accident. Due to the problems with Wyatt's left knee, Dr. Perry referred Wyatt to another orthopedic surgeon, Dr. Nathan Cohen.
Dr. Cohen saw Wyatt on June 1, 1993. He eventually performed an operation on February 4, 1994, for anterior cruciate ligament (ACL) insufficiency in the left knee. Dr. Cohen stated that there was no significant way to tell when the ACL was ruptured. He testified that it is possible for the injury to predate the accident. He further stated that it is also possible for an injury to exacerbate the knee and make it more symptomatic.
Dr. Cohen reviewed Dr. Steiner's report of Wyatt's 1989 surgery which was before this fall. The report indicated that the ACL was intact. Dr. Cohen stated that this showed that the ACL was injured after the last surgery. However, Dr. Steiner's report contradicts itself because it also stated that a decided jerk-type test indicated the ACL was not stable. Dr. Steiner, explaining the contradiction, stated that to the eye the ACL appeared intact, but that there was some abnormal motion when tested.
In discussing the diagnosis of impingement syndrome of Wyatt's left shoulder, Dr. Cohen also thought that a lapse of seven months between the fall and symptoms would indicate that the fall was not the problem. He explained that impingement syndrome can also be caused by overuse.
On August 31, 1994, Wyatt complained to Dr. Cohen about pain in his left hand which was consistent with a carpal tunnel syndrome. An EMG on September 13, 1994, indicated that Wyatt had mild carpal tunnel syndrome. Dr. Cohen testified that carpal tunnel syndrome is very common in people who traumatize their wrist by falling on it. Dr. Cohen released Wyatt on November 11, 1994.
Wyatt then returned to see Dr. Perry on March 14, 1996, complaining of knee, back, and left hip pain. At that time Dr. Perry recommended a functional capacity evaluation *750 (FCE). The FCE is designed to see what type of work Wyatt was capable of doing.
Raymond Menard, an occupational therapist, administered the FCE on April 4, 1996. The FCE indicated that Wyatt was performing at medium-level work. Medium-level work is defined in terms of lifting as the ability to lift 21 to 50 pounds. Wyatt's previous job as an extruder operator ranked as heavy-level work.
The last doctor Wyatt saw was another orthopedic surgeon, Dr. Robert Bernauer. Wyatt went to see Dr. Bernauer on April 26, 1996. Dr. Bernauer reviewed the records of Drs. Perry and Cohen and the FCE. He also reviewed an MRI performed in 1993 which indicated the impingement syndrome in the left shoulder. Dr. Bernauer scheduled another MRI which still indicated the impingement syndrome. He performed acromial plasty surgery and removed part of the bone that had a spur on it causing the impingement. Dr. Bernauer stated that after the surgery, Wyatt had full range of motion in his shoulder. Dr. Bernauer testified that the spur that caused the impingement syndrome can develop after trauma to a joint such as a fall. He further stated that the spur was evidence of a traumatic event and that the February fall more than likely caused the problems with his left shoulder.
Dr. Bernauer also performed a release of the carpal tunnel in the left hand. Dr. Bernauer agreed with Dr. Cohen that carpal tunnel syndrome can be caused by a fall. Dr. Bernauer also explained that there might not be symptoms from a carpal tunnel right after the fall.
An MRI of the left knee revealed the previous surgeries and a tear of the lateral meniscus of the cartilage on the outside of the knee. Dr. Bernauer indicated that Wyatt needed further orthoscopic surgery on the knee. However, Dr. Bernauer testified that he would defer to Dr. Cohen about future knee surgery. Dr. Bernauer also opined that the present knee problems were caused by the fall.

JUDGMENT NOTWITHSTANDING THE VERDICT
Wyatt contends that the trial court made a credibility determination in overturning the jury's verdict and granting a JNOV. Wyatt further contends that the trial court erred in finding that he failed to prove that Sonnier, as an employee of Red Stick/Cintas, was negligent. Wyatt also claims that the trial court erred in failing to find that he proved his injuries were related to the accident.
The criteria to be used when reviewing a JNOV granted by a trial court pursuant to La.Code Civ.P. art. 1811 was articulated by the supreme court in Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991), as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied.... In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a *751 different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

Liability
In its written reasons for judgment the trial court based its decision to grant the JNOV on the reasons it assigned orally at the hearing and on its written reasons when it ruled on the workers' compensation intervention on October 24, 1996. In finding that Wyatt had not proven liability in the intervention case, the trial court gave as its reasons:
The Court finds that Sonnier's explanation is more believable than that of Wyatt, particularly since Wyatt was unable to provide much detail about the accident itself. Plaintiff in his testimony was non-responsive to many of the questions asked both on direct and cross examination. The extent of the non-responsive answers at times had the appearance of evasiveness and seriously affected the Court's perception of the plaintiff [sic] credibility.
We note that at the end of the defendants' case the trial court, in ruling on a motion for a directed verdict by Wyatt, stated, "while I don't believe there is much in dispute on the facts of the accident itself, I think that the duty risk analysis in the tort case is appropriately left to the jury. And I think that the reasonable minds could conclude either way, depending on who they choose to believe and how they choose to approach the extent of the duty and the risk created by the actions of Mr. Sonnier."
As we explained earlier, the only factual dispute is whether Sonnier threw another shirt that hit Wyatt and caused him to fall as he was passing over the pile of dirty clothes. Wyatt claims that Sonnier threw a shirt on the pile as Wyatt was stepping over the pile. Wyatt claims that this shirt is what got entangled in his feet and caused him to fall. Sonnier denied that he threw a shirt down as Wyatt was passing. Wyatt admitted that he did not actually see Sonnier throw another shirt but that it felt like he did.
The trial court in oral reasons at the JNOV hearing stated: "It is not physically possible for Sonnier to have caused the accident given the description of the passing of Wyatt in front of Sonnier as he stepped away from the locker to allow Wyatt to pass." The trial court concluded that Wyatt did not establish by a preponderance of the evidence that the accident occurred that way.
In support of his contention that the accident occurred the way he claims it did, Wyatt directs us to Sonnier's own testimony. Sonnier admitted that he did not actually see Wyatt step over the clothes. Sonnier also admitted that he was blind in his left eye. Wyatt fell on Sonnier's left side. Sonnier testified that he immediately returned to his work of piling up the uniforms after Wyatt passed and before he heard him fall. We agree with Wyatt that the jury could have believed that Sonnier threw clothing which tangled on Wyatt's legs as he passed. Sonnier may have thought Wyatt had already stepped over the clothing, but he did not know that Wyatt was not completely over the pile because he could not see him. This is especially true since he had time to go back to work before he heard Wyatt fall. It is uncontradicted that Wyatt fell as he was stepping over the clothes and that Sonnier went back to his job before Wyatt fell.
The defendants tried to cast doubt on Wyatt's credibility. The defendants established that he had 19 accidents at work. They also got Wyatt to admit that since the accident, he had divorced, remarried, and fathered three different children with two different women. The defendants further established that during the four years Wyatt was off work after the accident, he built a porch, lifted weights, rode a bike for exercise, went scuba diving, and operated a canoe rental business. He even took his kids canoeing and did all the paddling. But the jury heard the same evidence that the trial judge heard.
The jury, even after hearing this testimony, must have found Wyatt credible and believed his story. Reasonable persons in the exercise of impartial judgment could have believed that the accident happened as Wyatt testified it did. The trial court erred in granting the motion for JNOV on the issue of liability.

*752 Medical Causation
The trial court also found that Wyatt's injuries were not caused by the fall. In its written reasons for judgment on the workers' compensation intervention claim, the court found that there were too many plausible explanations within the medical testimony for the source of the complaints of Wyatt. The issue was never really discussed at the hearing on the JNOV because liability was more the issue. However, the trial court did say "that certainly the jury could choose to reject the conclusions of the other medical experts and latch onto Dr. Bernauer as a reasonable medical expert that had sufficient basis for his opinion...."
Although the medical evidence does not overwhelmingly prove that Wyatt suffered the injuries he complained of as a result of the fall in the locker room, we find that there was a preponderance of the evidence in favor of Wyatt from which the jury could find that he suffered these injuries as a result of the fall. As pointed out by the trial court, Dr. Bernauer was very clear in his explanation of the injuries and their relation to this fall. Even Drs. Steiner, Perry, and Cohen admitted that the injuries complained of by Wyatt could have been caused by a traumatic event such as this fall.
Many of the doctors were reluctant to relate the shoulder and hand injuries to the fall due to the delay in complaints. However, when Wyatt first made these complaints, he always stated that it had been bothering him since the fall. As we pointed out earlier, the jury found Wyatt to be credible and believed that he suffered these injuries as a result of the fall. There was sufficient evidence in the record for the jury to make this decision. We also find that it would have been error to grant a JNOV on the issue of medical causation.

NEW TRIAL
The trial court conditionally granted the defendants' motion for new trial in the event the JNOV was reversed by this court. Pursuant to State Through Dept. of Transp. and Development v. Scramuzza, 610 So.2d 809 (La.1993), we will consider the merits of the granting of a new trial.
La.Code Civ.P. art.1972 provides that a new trial shall be granted when the verdict or judgment appears clearly contrary to the law and the evidence. This was the trial court's reason for conditionally granting a new trial.
Unlike the standard applicable to a motion for JNOV, the trial court may evaluate evidence without favoring any party, draw his own inferences and conclusions, and assess the credibility of witnesses when determining whether to grant a motion for a new trial. Morehead v. Ford Motor Co., 29,399 (La.App. 2 Cir. 5/21/97); 694 So.2d 650, writ denied, 97-1865 (La.11/7/97); 703 So.2d 1265. The trial court's discretion in ruling on a motion for new trial is great, and its decision will not be disturbed on appeal absent an abuse of that discretion. Id.
However, the discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Burris v. Wal-Mart Stores, Inc., 94-0921 (La.App. 1 Cir. 3/3/95); 652 So.2d 558, writ denied, 95-0858 (La.5/12/95); 654 So.2d 352. The fact that a determination on a motion for a new trial involves judicial discretion does not imply that the trial court can freely interfere with any verdict with which it disagrees. Id.
We realize that the trial court made a credibility determination, favoring Sonnier over Wyatt, as to how the accident happened. However, our review of the evidence does not indicate that the two had different stories. No one disputes how the accident occurred except to the extent of whether Sonnier threw clothing which landed on Wyatt's feet as he passed. Wyatt admitted that he did not actually see Sonnier throw any clothing. However, Sonnier testified that he went back to doing his job before the accident and that he was blind in his left eye which is the side where the accident occurred. There is a basis in the evidence for the jury to believe that Sonnier threw clothing which landed on Wyatt's foot when Sonnier thought that Wyatt had completely passed. This explanation *753 does not contradict either party's version of the accident.
We also find based on our earlier reasoning that there was a basis for the jury's decision with regard to the medical evidence. We find that the jury's verdict on both the issues of negligence and medical causation was not clearly contrary to the law and evidence. We do not find that a miscarriage of justice results from the jury's verdict. The trial court abused its discretion in granting a motion for a new trial. We therefore reverse the trial court's grant of a conditional new trial.

INTERVENOR'S CLAIM
Since we find that the trial court should not have granted a JNOV or new trial, the judgment incorporating the jury's verdict and the trial court's reconciled verdict on the intervention is the judgment that stands. Wyatt also appealed from this judgment. He first claims that the trial court erred in awarding $19,708.50 to Ampacet after it dismissed the claims of Ampacet in its intervention decision.
The February 10, 1997 judgment reflects that the court's decision to award money to Ampacet was because it reconciled its judgment with the jury's verdict. The court later set this award aside when it granted the JNOV as to liability. In Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984), the supreme court stated in dicta that the trial court could reconcile inconsistent decisions on a motion for JNOV or new trial. The trial court here did not reconcile the inconsistent verdicts in that manner. Although the trial court subsequently granted a JNOV and a conditional new trial, it was not to reconcile inconsistent verdicts. The trial court simply reconciled the two decisions on its own in the signed judgment of February 10, 1997, incorporating the jury's verdict, changing its own decision to conform to the jury's verdict.
Normally two separate judgments are rendered. The appellate court is then required to address both of the conflicting decisions, that of the jury and that of the trial judge, under the manifest error standard. Powell v. Regional Transit Authority, 96-0715 (La.6/18/97); 695 So.2d 1326. Powell, 695 So.2d at 1329, FN 4, also observed that inconsistent decisions on liability cannot be reconciled by a JNOV if reasonable minds could differ with respect to the evidence. See also Dowden v. Mid State Sand & Gravel Co. Inc., 95-231 (La.App. 3 Cir. 11/2/95); 664 So.2d 643, writ denied, 95-2864 (La.2/2/96); 666 So.2d 1099.
Ordinarily in a bifurcated trial where the jury and trial court reach conflicting findings of fact and there is an appeal, this court would resolve these differences and render a single harmonized decision based on the record as a whole. Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3 Cir.1987), writs denied, 522 So.2d 562, 563 (La.1988). However, we are faced with one judgment, part of which awards reimbursement to Ampacet for medical expenses it spent on behalf of Wyatt for the injuries which he claimed resulted from this accident. Therefore, we will review this judgment for manifest error.
We find that it was not manifest error to award the amount of undisputed medical expenses that Ampacet incurred less Wyatt's contributory negligence to Ampacet. Wyatt does not dispute that Ampacet paid these expenses on behalf of Wyatt for the injuries he complains he sustained as a result of the accident. Even if we were to face the issue of two judgments we would harmonize the two as the trial court did by allowing Ampacet reimbursement for the medical expenses since we find that the jury's verdict was reasonable.

DAMAGES
The jury awarded $40,000 in general damages to Wyatt. Wyatt complains that this award is abusively low. In reviewing general damages awards, the supreme court in Youn v. Maritime Overseas Corp.. 623 So.2d 1257, 1260-1261 (La.1993) explained:
The role of an appellate court in reviewing general damages is not to decide what it considers to be appropriate award, but rather to review exercise of discretion by trier of fact. Each case is different, and the adequacy or inadequacy of the award *754 should be determined by the facts or circumstances particular to the case under consideration.
. . . . .
[D]iscretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Wyatt argues that $40,000 in general damages is abusively low since he had to endure three surgeries; an ACL reconstruction, an acromion plasty surgery on his shoulder, and a carpal tunnel release in addition to extensive medical care. However, the jury had further evidence that all three surgeries were successful, Wyatt was suffering with knee pain just two months before the fall, he could return to some type of medium-level employment, and was able to lead a fairly active lifestyle. Under these circumstances we cannot say that $40,000 was abusively low.

SPECIAL DAMAGES
In their brief to this court, Sonnier, Red Stick/Cintas, and Lumberman's complain about the awards for loss of past and future wages and the award for medical expenses. Pursuant to Ventress v. Union Pacific Railroad Co., 96-0501 (La.5/3/96); 672 So.2d 668, we will address these issues even though the defendants neither appealed nor answered the appeal.

Lost Wages
The defendants object to the jury's award for both loss of past wages and loss of earning capacity. The burden of proving a loss of income is on the plaintiff. Myers v. Broussard, 96-1634 (La.App. 3 Cir. 5/21/97); 696 So.2d 88. "Past lost wages are susceptible of being calculated with mathematical certainty from the proof offered at trial, and thus, such an award is an exception to the much discretion rule." Id. at 97. "However, the jury must have a reasonable basis for exercising its discretion, and the record must provide a factual basis for the award." Id.
An FCE ordered by Dr. Perry revealed that Wyatt was capable of performing medium-level work. This means he could lift 21 to 50 pounds. Wyatt's job as an extruder operator was classified as heavy-level work because he would occasionally have to lift over 50 pounds. What is required of an extruder operator was not only explained by Wyatt's testimony but was also explained by the Liberty Mutual Form describing the weight to be lifted by an extruder operator as 50 to 70 pounds. Even Cecil Thompson, the plant manager at Ampacet, agreed that an extruder operator may have to fill in for a mixer and lift 70 pounds.
Based on the fact that Wyatt could return to only medium-level work, Dr. Michael Kurth, who teaches economics at McNeese State University, calculated Wyatt's lost wages. The defendants offered no evidence regarding Wyatt's wage loss relying on the medical evidence to dispute it. Dr. Kurth calculated Wyatt's past wage loss from the day he left employment at Ampacet, October 27, 1992. He based it on what Wyatt was earning at the time which was $15.50 an hour for 40 hours a week. He also added in 30% for fringe benefits provided by Ampacet. Dr. Kurth calculated a past wage loss of $168,391. The jury awarded $160,000 for loss of past wages. Given the fact that Dr. Bernauer testified that Wyatt could not return to work before he had his hand and shoulder surgery, we find that there was ample evidence to support the jury's award.
To recover for loss of future earning capacity, a plaintiff must prove the loss, not with mathematical certainty, but with reasonable certainty. Myers, 696 So.2d 88. "An award for loss of future earning capacity is not based merely upon the difference between the injured person's pre-accident wages and post-accident wages but rather it should be based on the difference *755 between the injured person's earning capacity before and after the accident." Id. at 98.
Dr. Kurth calculated Wyatt's total future wage loss at $903,717. This was based on a raise to $17.50 an hour for an extruder operator since Wyatt's accident and assuming that Wyatt does not return to work during the 26.1 remaining work-life expectancy. Dr. Kurth further testified that if Wyatt could earn minimum wage then he would have a loss of only $686,716. Dr. Kurth also calculated that Wyatt's wage loss would be $451,808 if he could earn $8.75 an hour.
The jury awarded only $30,000 to Wyatt for loss of earning capacity. Obviously, the jury considered the medical testimony of Dr. Bernauer that Wyatt is able to return to a medium-level job following his shoulder and hand surgery. An award of $30,000 was not abusively high based on the record.

Past Medical Expenses
The defendants also complain that the jury's award of $37,191.90 was in error since Wyatt had numerous injuries resulting from numerous accidents. To recover past medical expenses a plaintiff must prove that it is more probable than not that the medical treatment was necessitated by the trauma suffered in the accident. Myers, 696 So.2d 88.
As we have previously discussed in this opinion there was conflicting testimony regarding the relation of Wyatt's ACL problem, shoulder impingement, and carpal tunnel problem to the February 1992 fall. However, based on Wyatt's complaints to the doctors that he suffered these problems right after the fall and Dr. Bernauer's testimony which relates these problems to the fall, along with other evidence we have previously discussed, we cannot say that the jury erred in awarding medical expenses incurred in the treatment and diagnosis of these problems by the various doctors.

FAULT
The defendants also complain that the jury erred in assessing Wyatt with only 35% of the fault for the accident. They argue that he had an alternative route to his locker but instead chose a route that had a pile of clothes in the walkway.
Assessment of fault is a question of fact subject to the manifest error rule. Lemaire v. Estate of Harrington, 97-256 (La. App. 3 Cir. 10/8/97); 701 So.2d 484. Reviewing the record, including the testimony of both Wyatt, Sonnier, and Hamilton, (the coworker occupying the other aisle at the time of the fall), we cannot say that the jury was manifestly erroneous in placing only 35% of the fault on Wyatt.

COSTS
Wyatt complains that the trial court apportioned the costs among all the parties. Wyatt wants this court to order that the costs be apportioned among the parties in accordance with the percentage of fault found by this court. Further, Wyatt requests that to the extent he is cast for any of the costs, that Ampacet be ordered to bear all or a portion of the costs of this litigation.
Since we are reinstating the judgment signed on February 10, 1997, and incorporating the jury verdict, there is no need to apportion costs since the trial court did so according to the percentage of fault as requested by Wyatt. Furthermore, La.Code Civ.P. art.1920 provides the general rule that costs shall be paid by the party cast in judgment. Since Ampacet was not cast in judgment, we do not see any reason to disturb the trial court's ruling.
For the reasons expressed in this opinion, the judgment of the trial court granting defendants' judgment notwithstanding the verdict and a conditional new trial is reversed. The judgment of the trial court signed on February 10, 1997, is affirmed. Costs of appeal are assessed to Ray Sonnier, Red Stick Services, Inc., Cintas Sales Corporation of Louisiana, Inc., and Lumberman's Mutual Casualty Company.
JUDGMENT OF MAY 28, 1997, REVERSED; JUDGMENT OF FEBRUARY 11, 1997, REINSTATED.