STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-0625

EVERETTE DAVIS, JR., ET UX.

VERSUS

STATE OF LOUISIANA THROUGH
THE DEPARTMENT OF TRANSPORTATION
AND DEVELOPMENT

* * * * * * * *

SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CATAHOULA, NO. 19,677 "A"
HONORABLE KATHY JOHNSON, DISTRICT JUDGE

* * * * * * * *

JIMMIE C. PETERS
JUDGE

* * * * * * * *

Court composed of John D. Saunders, Jimmie C. Peters, and Marc T. Amy, Judges.

**REVERSED AND RENDERED.**

Jack F. Owens, Jr.
Attorney at Law
P. O. Box 595
Harrisonburg, Louisiana 71340
(318) 744-5431
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Everette Davis, Jr.
    Sheila Creel Davis

James D. "Buddy" Caldwell
Attorney General
J. Albert Ellis
Assistant Attorney General
Louisiana Department of Justice
Litigation Division-Monroe
130 DeSiard Street, Suite 812
Monroe, Louisiana 71201
(318) 362-5250
COUNSEL FOR DEFENDANT/APPELLANT:
    State of Louisiana, Through the Department of
    Transportation and Development

PETERS, J.

This litigation arises from a September 1, 1995 single-vehicle automobile accident wherein the plaintiff, Everette Davis, Jr., sustained severe personal injuries. After a jury rejected Mr. Davis' claims against the defendant, the State of Louisiana, through the Department of Transportation and Development (hereinafter referred to as DOTD), the trial court granted a judgment notwithstanding the verdict (JNOV) finding that Mr. Davis and DOTD were equally at fault in causing the accident and Mr. Davis' resulting injuries. The trial court made the conditional ruling that it would grant a new trial in the event that its JNOV were reversed. DOTD has appealed that trial court judgment, asserting seven assignments of error. For the following reasons, we reverse the trial court's grant of the JNOV, reverse the conditional grant of a new trial, and reinstate the jury verdict.

## DISCUSSION OF THE RECORD

This litigation arises out of a single-vehicle accident that occurred at approximately 7:55 p.m. on September 1, 1995, on Louisiana Highway 3101 in Catahoula Parish. Mr. Davis was traveling west along Louisiana Highway 3101 when he lost control of his vehicle while traversing a slight curve to the left in the highway. When Mr. Davis initially entered the curve, his right wheels left the roadway and he traveled down the shoulder of the road in that position for approximately 251 feet. He then attempted to return the right wheels to the highway pavement. When he attempted this maneuver, the vehicle rotated a quarter of a turn and skidded west down the highway another eighty-eight feet. The vehicle then exited the roadway on the left side of the road and travelled 203 feet through the adjacent field before it flipped upside down and skidded an additional twenty-eight feet in that position. The vehicle then flipped again,

landing right side up. At some point as the vehicle was flipping over, Mr. Davis was ejected from the vehicle and landed approximately thirty feet from where the vehicle came to rest. Mr. Davis suffered severe injuries in this accident and is now a paraplegic.

On August 23, 1996, Mr. Davis and his wife, Sheila Creel Davis,[1] brought suit against DOTD, asserting that DOTD failed to inspect and maintain the highway such that it contained "unprecedented pot holes and dips, and unsafe shoulders;" that DOTD failed to properly post speed, curve, or other warning signs; and that DOTD failed to establish a restricted speed zone because of the highway's substandard condition. The matter finally went to trial some thirteen years later, beginning August 10, 2009.

At trial, Mr. Davis described the vehicle he was driving at the time of the accident as a 1975 Dodge camper van with the camper portion having been removed by the previous owner. It had two tires on the front, but dual tires on the rear. Mr. Davis had intended to convert the van into a flatbed truck, but had not done so before the accident. According to Mr. Davis, the vehicle would not accelerate past fifty to fifty-five miles per hour without "sputtering and spitting."[2] Additionally, he suggested that when driven, the vehicle "kinda shimmied on the front end."

According to Mr. Davis, the accident happened as he was returning from his mother-in-law's home. He described the mechanics of the accident in the following manner:

> As far as I can remember I run[sic] off the right hand side of the
> road and just went down the road for a ways. Because it was a bad

---

[1] Both the jury and the trial court rejected Mrs. Davis' claim for damages and that issue is not before us in this appeal.

[2] He later admitted in his testimony that the truck might reach speeds of up to seventy-five miles per hour "going downhill."

> drop off. I drove down the road on the right, you know, on the curved side for a while because I thought I could get back on the road, I reckon. So I went a ways trying to get back up on it. Eased back up on the road and that was when it started flipping. I don't remember nothing after that.

Mr. Davis testified that he did not observe any traffic control signs as he approached the curve, and that he did not remember seeing any centerline on the highway. He described the ride along the road as "like riding a roller coaster" because of the patchwork and potholes on the highway. With regard to why he left the highway surface initially, he suggested that he did so to avoid a pothole. However, with regard to the size of the pothole, he could not remember. Additionally, he testified that he did not realize he was in a curve because he was "kind of disoriented." He described the surrounding conditions as "dusk" but could not remember if he had his lights on. When asked his speed at the time he left the road, he stated that he had "no idea" as to his speed, but knew he was not speeding because of the truck's defects. When questioned further concerning his speed, he stated that it would be impossible to ascertain because he was not even certain if the speedometer worked.

Mr. Davis had paid $300.00 for his truck while living in Texas, and it was not in the best of shape.[3] Additionally, although the first time he negotiated this particular curve with the 1975 Dodge was the evening of the accident, he was very familiar with the highway itself and he had traversed this curve in at least twelve other vehicles "over the years" before the accident. When questioned about his sobriety at the time of the accident, Mr. Davis acknowledged that his truck may have contained half-empty beer bottles, but when asked if he had consumed a beer before the accident, he stated that "I don't think I did." He suggested that if the

_____

[3]Mr. Davis acknowledged on cross-examination that the tires were not in the best of shape when he bought the vehicle and he had not changed them since acquiring ownership.

odor of beer were at the accident scene, it was present because "any roughneck's vehicle, after you turn it, after you flip it a few times, it's going to smell like a beer." However, when questioned concerning his prior deposition testimony, Mr. Davis acknowledged that he had previously testified he had consumed "a few beers when [he] was swimming" that day. When pressed in the deposition, he stated that he had consumed three or four cans of beer.

Former Louisiana State Trooper and accident reconstruction expert, John Blunschi of Ferriday, Louisiana, testified on behalf of the plaintiffs and concluded that the absence of warning signs and a double yellow center line caused Mr. Davis' accident. He based this conclusion on his review of deposition testimony, Trooper Franklin's accident report, and pictures taken at the scene some twenty-one days after the accident. Mr. Blunschi also visited the accident scene, but did so on June 3, 2009, or almost fourteen years after the accident.[4] According to Mr. Blunschi, the substandard nature of Louisiana Highway 3101 coupled with the sharp nature of the curve justified a reduced speed limit sign approaching the curve from the west, and possibly even double yellow lines to signal that the curve was a no passing zone.

In response to the testimony concerning how the accident happened, DOTD offered the testimony of Louisiana State Trooper Sammy Glen Franklin, the officer who investigated the accident, and Kelly Seal Adamson, a College Station, Texas accident reconstruction expert and professional engineer licensed in Texas, Louisiana, and Mississippi.

Trooper Franklin arrived at the accident scene approximately twenty-five minutes after it occurred and while Mr. Davis was still on the scene. He proceeded

_____
[4]Mr. Blunschi acknowledged that his visit to the scene was not helpful because the highway had changed significantly since the time of the accident. However, because he was not retained until three months before the August 2009 trial, he did not have the opportunity to view the scene before that time.

4

to walk the path of the accident, making measurements and observations necessary to complete his accident report. At trial, Trooper Franklin's July 30, 2009 deposition was read to the jury. Trooper Franklin said he had little independent recollection of the accident investigation given the time that had passed, and based much of his testimony on the findings recorded on the accident report. In reviewing his accident report, Trooper Franklin testified that he estimated Mr. Davis' speed to be in excess of seventy-five miles per hour when his right wheels left the paved surface of the highway. This speed, according to Trooper Franklin, was over twenty miles per hour above the fifty-five mile per hour speed limit on Louisiana Highway 3101. Additionally, Trooper Franklin found no defects in the highway that would have caused the accident. After completing his investigation, he issued two citations to Mr. Davis: one for careless operation of the vehicle, a violation of La.R.S. 32:58; and one for failure to wear a seatbelt, a violation of La.R.S. 32:295.1. When asked why he issued these citations, he stated the following:

> Basically because Mr. Davis, I believe . . . entered a curve too fast and was unable to maintain control or negotiate the curve, and he ran off the road to the right, and over-corrected, and crossed back over the road, at which time, his vehicle to rotate[sic] and went into the cotton field. And I believe it flipped onto its top, and then came to rest upright on its tires.

Trooper Franklin had also marked on the accident report that Mr. Davis had been drinking and was impaired when operating the vehicle. Although he had no independent knowledge of why he made that notation, he acknowledged that it could well have been recorded because of the smell of alcohol or the presence of empty beer cans that appeared to have been recently consumed at the scene. Trooper Franklin also recalled the presence of a dashed yellow line dividing the lanes of travel.

5

Mr. Adamson also reviewed the deposition testimony taken in this case, reviewed the accident report, and visited the scene.[5] Combining the results of his survey with the measurements provided by Trooper Franklin, Mr. Adamson concluded that the curve radius would accommodate a speed of fifty to fifty-five miles per hour while a vehicle was traversing it. He also concluded, based on his review of the pictures taken shortly after the accident, that the drop-off between the highway surface and shoulder was two inches or less. According to Mr. Adamson, it is only when the drop-offs exceed three inches that they become a problem, and even then drop-offs of less than five inches are subject to scheduled maintenance instead of requiring immediate attention.

Mr. Adamson agreed with Trooper Franklin that Mr. Davis' right tires left the paved surface at a speed in excess of seventy miles per hour. He reached this conclusion based on his analysis of the directions and distances traveled during the accident. According to Mr. Adamson, the curve's critical speed[6] was in excess of one hundred miles per hour. However, he found the appropriate design speed[7] for this curve to be fifty to fifty-five miles per hour.

Although Mr. Adamson was of the opinion that the curve should have signs establishing a fifty mile per hour speed limit for a motorist approaching from either direction, he testified that such signs were not required given the design and size of the curve, and that the absence of signs played no part in causing the September 1, 1995 accident. Additionally, even assuming no yellow lines were present on the

---

[5]As part of his activity in visiting the scene, Mr. Adamson conducted a physical survey of the curve which he stated was necessary to determine the radius of the curve. According to Mr. Adamson, he could then use the radius of the curve to calculate whether a vehicle could traverse the curve at a given velocity. However, just as was the case with Mr. Blunschi, Mr. Adamson did not examine the accident scene until shortly before the trial.

[6]Mr. Adamson described the critical speed as the speed "a vehicle could potentially go through this curve without losing control."

[7]Mr. Adamson described the design speed as the speed that creates a "critical comfort level" for the person traversing the curve.

highway on September 1, 1995, that fact would have played no part in the accident. According to Mr. Adamson, double yellow lines warn a motorist of the presence of a no passing zone, and dashed yellow lines simply divide the lanes of travel.[8]

Mr. Adamson also was of the opinion that the alterations to Mr. Davis' Dodge van contributed to his inability to maintain control while traversing the curve. According to Mr. Adamson, the alterations changed the vehicle's center of gravity and made it more susceptible to rolling over.

According to Mr. Adamson, the accident was caused by a number of factors, but that none were the fault of DOTD. The principal causes of the accident, according to Mr. Adamson, were Mr. Davis' excess speed and his inattentiveness.

In its answers to the first interrogatory propounded to it, the jury unanimously found that Louisiana Highway 3101 did not have a defect that created an unreasonable risk of harm on September 1, 1995. With that answer, the jury rejected the plaintiffs' claims against DOTD. After the trial court reduced the jury's verdict to writing on August 20, 2009, the plaintiffs timely filed a motion for new trial and, in the alternative, a JNOV. The trial court heard argument on the motion on December 14, 2009, and took the issue under advisement. On November 5, 2010, the trial court issued written reasons for judgment setting aside the jury verdict. In summarizing its findings that the plaintiffs had established an unreasonably dangerous condition in Louisiana Highway 3101, the trial court stated:

> Had the "curve" sign and speed sign been posted, as testified to by Johnny Blunschi, the plaintiff *may* have averted this accident and the presence of the signs would have put him on notice to reduce his speed. The purpose of posting such signs is to notify all motorists of the presence of a dangerous condition such as a curve of the type where plaintiff's accident occurred.

---

[8]In fact, Mr. Adamson testified that yellow lines were present on the day of the accident as they are visible on the pictures taken shortly after the accident.

(Emphasis added.)

Based on this conclusion, the trial court set aside the jury verdict and entered judgment which, among other things, granted the JNOV to the extent that it found Mr. Davis and DOTD to be equally at fault in causing the accident.[9] The trial court reduced its ruling to judgment on November 12, 2010, and this appeal followed.

In its appeal, DOTD raises seven assignments of error:

1. Trial court erred in granting JNOV on the issue of DOTD's liability and in granting a new trial in the alternative.

2. Trial court erred in evaluating the credibility of the witnesses.

3. Trial court erred in awarding plaintiff damages, general and special, a reversionary future medical expenses trust. [sic]

4. Trial court erred in allocating 50% fault to DOTD.

5. Trial court erred in taxing court costs, including expert witness fees[,] to DOTD.

6. Trial court erred in substituting its judgment for that of the jury.

7. Trial court erred as a matter of law in finding the ends of justice mandated granting a JNOV and new trial.

## OPINION

We need only consider DOTD's first assignment of error to dispose of this appeal. The supreme court set out the criteria for the reviewing court's evaluation of the trial court's grant or rejection of a JNOV in *Joseph v. Broussard Rice Mill, Inc.*, 00-628, pp. 4-5, (La. 10/30/00), 772 So.2d 94, 99:

> LA.CODE CIV. PROC. art. 1811 controls the use of JNOV. Although the article does not specify the grounds on which a trial judge may grant a JNOV, in *Scott v. Hospital Serv. Dist. No. 1*, 496 So.2d 270 (La.1986), we set forth the criteria used in determining when a JNOV is proper. As enunciated in *Scott*, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be

---

[9]The other provisions of the trial court's judgment need not be addressed by this court because we find that the trial court erred in granting the JNOV.

8

granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable persons in the exercise of impartial judgment might reach different conclusions. *Scott*, 496 So.2d at 274. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact." *Scott*, 496 So.2d at 273; *Jinks v. Wright*, 520 So.2d 792, 794 (La.App. 3 Cir.1987).

In reviewing a trial court's decision on whether or not to grant a JNOV, the appellate court must determine if the trial court erred in granting or denying the JNOV "by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict?" *Id.* at 99. If the answer to that question is in the affirmative, then the motion should have been granted. If not, it should be rejected. *Id.*

Regardless of whether a plaintiff seeks damages from DOTD under a strict liability claim pursuant to La.Civ.Code art. 2317 and La.R.S. 9:2800 or under a negligence claim pursuant to La.Civ.Code art. 2315, the legal analysis is the same, with the plaintiff bearing the burden of establishing that: (1) DOTD had custody of the thing that caused the plaintiff's injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) DOTD had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiff's injuries. *Henderson v. Nissan Motor Corp. USA*,

9

03-606 (La. 2/6/04), 869 So.2d 62; *Netecke v. State through. DOTD*, 98-1182, 98-1197 (La.10/19/99), 747 So.2d 489.

The custody element is not in dispute, and the jury disposed of the entire claim by concluding that the plaintiffs had not established that there existed a defect in Louisiana Highway 3101 that created an unreasonable risk of harm to Mr. Davis. We also conclude that the facts and inferences in this matter do not point so strongly and overwhelmingly in favor of Mr. Davis that reasonable persons could not have reached a conclusion that Mr. Davis failed in his burden of proof.

In reaching its conclusion that the JNOV should be granted, the trial court relied exclusively on Mr. Blunschi's testimony. We find this to be error on the part of the trial court.

Mr. Blunschi testified that although he has often been certified as an accident reconstruction expert, he had no specific training in road design, construction, or maintenance; and that any knowledge he might have concerning signage requirements would come from referencing the appropriate manuals, including specifically the ASHTO Manual. In evaluating the specifics of the September 1, 1995 accident, he acknowledged that he was somewhat handicapped because of the overlay and improvements to the road that had been accomplished since 1995. He did not testify that warning signs did not exist in 1995. Instead, he testified that he saw no evidence of signs when he visited the scene in 2009. Although he did not dispute Trooper Franklin's assertion that the speed limit was fifty-five miles per hour on September 1, 1995, he suggested that the substandard nature of the highway warranted a forty-five miles per hour speed limit.

With regard to the nature of the curve itself, Mr. Blunschi asserted that the curve was sharp enough to require a reduced speed limit and a double yellow line. However, he based this on his experience in driving the curve in 2009 and nothing

more. Additionally, he suggested that because of the crops along the highway,[10] and because there was no tree line or fence row between the crop and the highway, a motorist might not realize that he was approaching the curve.

Mr. Blunschi also acknowledged that he did not know the speed at which Mr. Davis' right wheels left the paved surface, nor did he attempt to factor in the appropriate reaction time in determining the cause of the accident. He seemed to suggest that Mr. Davis had regained control of his vehicle before he attempted to turn his right wheels back onto the highway and that he may have accelerated as he attempted this maneuver.[11] He had no opinion concerning whether the modifications to the vehicle played any part in the accident. When asked whether the accident could have occurred if Mr. Davis' vehicle would not go over fifty to fifty-five miles per hour, he could only respond: "I think so." Finally, he also acknowledged that one of the causes of the accident was Mr. Davis' inattention.

We do not have to determine whether, standing alone, Mr. Blunschi's testimony would have been sufficient to carry Mr. Davis' burden of proof on this element of the analysis. The jury also heard the testimony of Trooper Franklin who placed Mr. Davis' exit speed at over seventy-five miles per hour, who inspected the entire scene and found no defect in the highway that would have contributed to the accident, and who determined that the highway was marked by a yellow dashed center line. While also noting the presence of alcohol and concluding that Mr. Davis was an impaired driver at the time of the accident, Trooper Franklin determined that the accident was caused by Mr. Davis' failure to maintain control of his vehicle, and he issued two citations on this basis.

---

[10]Mr. Blunschi identified the crop growing on the day of his visit as corn. However, it is not disputed that the crop on September 1, 1995 was cotton.

[11]Mr. Blunschi testified that it would not have been unusual for Mr. Davis to accelerate as he attempted to reenter the highway.

11

Finally, Mr. Adamson performed the same basic analysis as Mr. Blunschi, but expounded on that analysis by using his engineering abilities to calculate the various physical aspects of the curve. In performing this analysis, Mr. Adamson concluded that the curve radius allowed for a design speed of fifty to fifty-five miles per hour, that the drop off from the pavement to the shoulder was insignificant, and that Mr. Davis' exit speed was in excess of seventy-five miles per hour. While he suggested that warning signs might have been helpful, Mr. Adamson was of the opinion that design specifications did not require them and that, in any event, the lack of signs played no part in the accident causation. Also, while concluding that the photographs taken soon after the accident established the presence of a visible center line, he was of the opinion that the presence or absence of a center line played no part in the accident causation.

Given our analysis of the record, we find merit in DOTD's first assignment of error and reverse the trial court's grant of the JNOV. That reversal renders moot DOTD's next three assignments of error.

We also find merit in DOTD's fifth assignment of error and reverse the trial court's judgment taxing costs against DOTD. While La.Code Civ.P. art. 1920 gives the trial court discretion in awarding costs, the party cast in judgment is usually the party taxed with costs. *Ark-La-Mis Timber Co., Inc. v. Wilkins*, 36,485 (La.App. 2 Cir. 12/11/02), 833 So.2d 1154. In this case, the basis of the trial court's taxing costs of court to DOTD was the grant of the JNOV finding DOTD fifty percent at fault in causing the accident sued upon. Were that judgment to stand, the trial court's assessment of all costs against DOTD might not be an abuse of discretion. *See Gauthier v. Wilson,* 04-2527, 04-2528, 04-2529, 04-2530, 04-2531, 04-2532, 04-2533, 04-2534 (La.App. 1 Cir. 11/4/05), 927 So.2d 383, *writ denied*, 05-2402 (La. 3/31/06), 925 So.2d 1258. However, we find no authority for

12

the assessment of all costs against a party which successfully defended the action filed against it. Thus, we reverse the trial court and assess all costs of the trial proceedings to Everette Davis, Jr. and Sheila Creel Davis.

Finally, we must address DOTD's final assignment of error, wherein it complains that the trial court erred in awarding a new trial as conditional relief to Mr. Davis in the event this court reversed its grant of the JNOV. Louisiana Code of Civil Procedure Article 1972(1) provides that a new trial shall be granted "[w]hen the verdict or judgment appears clearly contrary to the law and the evidence." We review the decision to grant or reject a motion for new trial on an abuse of discretion standard. *Martin v. Heritage Manor S.*, 00-1023 (La. 4/3/01), 784 So.2d 627. In *Martin*, the supreme court explained the review requirements applicable to this court:

> Although the granting of a new trial is mandatory if the trial court finds that the verdict is contrary to the law and evidence under La. C.C.P. art. 1972, the jurisprudence interpreting the provision recognizes the trial judge's discretion in determining whether the evidence is contrary to the law and evidence. As this Court has stated, the decision of "[w]hether to grant a new trial requires a discretionary balancing of many factors." *Davis v. Wal-Mart Stores, Inc.*, 00-0445 (La.11/28/00), 774 So.2d 84 (citing *Gibson v. Bossier City General Hospital*, 594 So.2d 1332 (La.App. 2 Cir.1991)). In *Davis*, we explained:
>
> > [a]lthough the granting or denying of a motion for new trial rests within the wide discretion of the trial court, the discretion of the court is limited:
> >
> > > The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily

13

usurp the jury's responsibility. *A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light.* Thus, the jury's verdict should not be set aside if it is *supportable by any fair interpretation of the evidence. Gibson v. Bossier City General Hospital, et al., supra. See also Engolia v. Allain*, 625 So.2d 723 (La.App. 1 Cir.1993). (Emphasis added.)

*Davis, supra*, op. at p. 10, 774 So.2d at 93. In considering a motion for new trial under La. C.C.P. art. 1972, "the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness." *Joseph v. Broussard Rice Mill, Inc.*, 00-0628 (La.10/30/00), 772 So.2d 94 (citing *Smith v. American Indem. Ins. Co.*, 598 So.2d 486 (La.App. 2 Cir.), *writ denied*, 600 So.2d 685 (La.1992)). However, this does not mean that the trial judge can usurp the jury's fact-finding role.

A motion for a new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. *Id.* "Although the language is similar between the standards for a JNOV and new trial, there is a real difference between a finding that no evidence existed for a rational jury to reach a particular result and a finding that a jury could not have reached its conclusion on any fair interpretation of the evidence." *Gibson, supra* at 1336. Notably, in considering whether the verdict was supported by any "fair interpretation of the evidence" on a motion for new trial, the trial judge is free to weigh the evidence and make credibility determinations, and is not required to view the evidence in the light most favorable to the non-movant as on a JNOV motion.

In addition, as opposed to the granting of a motion for new trial on the grounds that the verdict is contrary to the evidence, which is directed squarely at the accuracy of the jury's factual determinations, noted federal procedural law commentators have stated that "whether the evidence presented at trial is sufficient to create an issue of fact for the jury or will permit the court to enter a judgment as a matter of law is solely a question of law." Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure, Vol. 9A, § 2524, p. 249 (West 1995). These commentators have further explained the differences between motions for a judgment as a matter of law and a new trial in that, while the trial judge has great discretion to determine whether the verdict is contrary to the law or the evidence on a motion

14

for new trial, "[o]n a judgment as a matter of law, [the trial judge] has no discretion whatsoever and considers only the question of law whether there is sufficient evidence to raise a jury issue." *Id*., § 2531, p. 302. These same differences exist between a motion for a JNOV and a new trial under Louisiana law.

Having reviewed the standard for granting or denying a motion for new trial, and considering the differences between that standard and the standard for granting a JNOV, we now turn to the standard of review. The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. *Joseph, supra* at p. 15, 772 So.2d at 104-05 (citing *Anthony v. Davis Lumber*, 629 So.2d 329 (La.1993)); *Davis, supra* at p. 10, 774 So.2d at 93 (citing *Wyatt v. Red Stick Services, Inc.*, 97-1345 (La.App. 3 Cir. 4/1/98), 711 So.2d 745); see also La. C.C.P. art. 1971, Official Revision Comment (d) ("Although the trial court has much discretion regarding applications for new trial, in a case of manifest abuse the appellate court will not hesitate to set the trial court's ruling aside, or grant a new trial when timely applied for").

Although the standard of review is clear, the application of that standard is not so easy. *See Davis, supra* (Concurring Opinion of Justice Lemmon). In *Davis*, we noted that in reviewing a ruling on a motion for new trial, "we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial." *Davis, supra* at 11, 774 So.2d at 93-94. "The scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case." *Id*.

*Id.* at 630-32 (footnotes omitted).

Based on our earlier review of the evidence, we find that the jury's decision that Louisiana Highway 3101 was not defective was not clearly contrary to the law and evidence. Accordingly, the trial court abused its discretion in conditionally granting a motion for a new trial. We reverse the trial court's grant of a conditional new trial and reinstate the jury verdict dismissing Mr. Davis' claims against DOTD.

## DISPOSITION

For the foregoing reasons, we reverse the trial court's grant of a judgment notwithstanding the verdict; reverse the trial court's assessment of trial costs to the

State of Louisiana, through the Department of Transportation and Development and assess those costs to Everette Davis, Jr. and Sheila Creel Davis; reverse the trial court's conditional grant of a new trial; and render judgment reinstating the jury verdict in favor of the State of Louisiana, through the Department of Transportation and Development. We assess all costs of this appeal to Everette Davis, Jr.

**REVERSED AND RENDERED**.